## THE STATE v. H. W. MORRIS, Appellant.

Division Two, November 29, 1910.

1. **BILL OF EXCEPTIONS: Signed by Disqualified Judge as "Acting Judge."** Where the regular judge disqualified himself and called in another judge, who tried the case and overruled defendant's motion for a new trial, and granted him time to file a bill of exceptions, and before that time expired went out of office, the regular judge may, under the statute (Sec. 2032, R. S. 1909), as "acting judge of the court where the case was heard," settle, approve and sign the bill of exceptions, when time-

ly presented, notwithstanding he had been disqualified to try the case.

2. FALSE PRETENSE: Money Obtained Upon Promise. The essence of obtaining money or property by means of false and fraudulent representation is that the money or property must be obtained by means of the false pretense. To receive money upon a promise to obtain a deed if the owners of the land will sell it when the balance of the purchase price is paid, is not such offense. The offense is a false and fraudulent representation of an existing fact; not a mere promise to do something in the future, in reliance upon which the promisee pays money to the promisor.

3. ————: ————: Agent to Sell Land: Continuance. If defendant was the agent of the owners to sell lands at the time the prospective purchaser paid him money in pursuance of an agreement that a deed would be made when all the purchase price was paid, and after the agency was dissolved and the lands taken off the market such representations were not repeated, and thereafter defendant and such purchaser dealt with each other upon an assumption that defendant could procure a deed if the purchaser paid for the land in full when it should later be placed upon the market, there is no false pretense. In that case, it was money paid to the defendant to the purchaser's use, and which he was bound to return on demand, and failure to return it created a civil liability, but it was not the offense of obtaining money under false and fraudulent pretenses.

Appeal from Stone Circuit Court—*Hon. A. W. Lincoln,* Special Judge.

REVERSED.

*G. W. Thornburg* and *T. L. Viles* for appellant.

The gist of this offense is the false and fraudulent representations made by the defendant. Therefore these must be clearly established. State v. Dines, 206 Mo. 675. All the representations made by the defendant in this case as testified to were made to H. C. Morris and his wife, and were made about the 27th day of August, 1907, and prior thereto, and all were at the time true, as defendant H. W. Morris was at that time a sale agent for the Crocker lands in Stone county, and authorized to contract the sale of the land men-

tioned in this case, and his authority as such agent continued until about September 16, 1907. While the acts and conduct of the defendant may have been reprehensible from a moral point of view, yet the evidence in this case does not establish the essential elements of the offense of obtaining money under false pretenses as defined by the statute.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

No valid bill of exceptions was ever filed in this case. Judge Moore having disqualified himself from trying this case, had no authority thereafter to sign the bill of exceptions. Judge Lincoln, during his term of office, and Judge Page, as his successor in office, are the only persons who had authority to sign the bill of exceptions herein. Had Judge Lincoln been reelected, he would still have had jurisdiction to sign the bill of exceptions. Judge Moore, being incompetent to try this case under the provisions of sec. 2594, R. S. 1899, and having so declared his incompetency by an order of record, he could not thereafter legally sign the bill of exceptions in this case. State ex rel. v. Perkins, 139 Mo. 118; State v. Gordon, 196 Mo. 185. In the light of our decisions Judge Lincoln was the proper one to sign the bill of exceptions herein until he went out of office on the first Monday in January, 1909. State v. Gordon, supra; Mayes v. Palmer, 206 Mo. 301; State v. Grant, 124 Mo. App. 129; Ranney v. Packing Co., 132 Mo. App. 324. If all the cases tried by Judge Lincoln in counties outside of his circuit, and in which he had not signed the bills of exceptions at the time he went out of office, are to be treated just the same as all the cases tried by him in his own circuit and in which he had not signed the bills of exceptions at the time he went out of office, then there can be no doubt but that Judge Page, his successor in office, was the proper person to sign the bill of exceptions in this

case, under the provisions of sec. 731, R. S. 1899. If such cases, tried out of the circuit by a regular judge, are not to be so treated, then there is no statutory provision for any one to sign such bills of exception after the judge who was called in to try such cases has gone out of office. There is no valid bill of exceptions, and, the record proper being free from error, the judgment of the trial court should be affirmed.

GANTT, P. J.—This is an appeal from a sentence of the circuit court of Stone county. The defendant was indicted at the March term, 1908. Judge John T. Moore, the regular judge of that circuit, disqualified himself, by his order of record, and called in Judge A. W. Lincoln of the criminal court of Greene county. At the November term, 1908, Judge Lincoln, with a jury, tried the cause, and defendant was found guilty of obtaining money under false pretenses, and his punishment assessed at two years in the penitentiary. His motions for new trial and in arrest were heard and overruled, and he was duly sentenced. At the same term the court made an order allowing defendant to file his bill of exceptions by the first day of the next regular term of the said court, which was March 8, 1909. Judge Lincoln's term of office as judge of the criminal court of Greene county, expired January 1st, 1909, Judge Alfred Page having been elected at the November election, 1908, and qualified as such. The defendant prepared his bill of exceptions and tendered the same to Judge John T. Moore on the first day of the March term, 1909, and Judge Moore signed the same and ordered it filed.

I. Counsel for defendant have argued the exceptions saved during the trial, but they are met by the contention that there is no valid bill of exceptions; that Judge Moore, the regular judge of the circuit court, having signed the same after having disqualified him-

self on the record to try the cause and called in Judge Lincoln of the criminal court to preside on the trial, could not lawfully sign the bill. Judge Lincoln's term of office had expired January 1, 1909, and the bill of exceptions was not tendered until March 8, 1909.

Section 731, Revised Statutes of 1899, in force when this bill of exceptions was signed by Judge Moore, and now, provided: "In any case where the judge who heard the cause shall go out of office before signing the bill of exceptions, such bill, if agreed to be true by the parties to the action, or their attorneys, or shown to the judge to be correct, shall be signed by the succeeding or acting judge of the court where the case was heard."

That Judge Moore was not the "succeeding judge" to Judge Lincoln within the meaning of the foregoing section is, we think, too plain for doubt. Judge Page succeeded Judge Lincoln as judge of the criminal court of Greene county, but as he did not sign the bill, it is unnecessary to determine whether he could have lawfully signed the bill in cases where Judge Lincoln had acted in other jurisdictions, when called to act in the place of another judge under our statutes. The question is, did Judge Moore have authority to validate the bill under the clause "acting judge of the court where the case was heard." He was the regular judge of the Stone circuit court, and was both *de facto* and *de jure* "the acting judge of the court where this case was tried," and therefore he came within the strict letter of the statute and was authorized to sign the bill, unless the contention of the Attorney-General, that he was not authorized to sign the bill by reason of his having disqualified himself on the record on account of *being interested and prejudiced* is sound. In a word does this disqualification attach itself as a necessary exception to the otherwise plain and unconditional words of the statute and require that it shall be read into the act?

It has often been said that the letter of the statute may be enlarged or restrained according to the true intent of the law, because the reason of the law prevails over its letter and one section in a statute sometimes indicates the true intent of the lawmaker and the statute can only be properly construed by reading it as a connected whole.

An example of this principle in the interpretation of statutes is found in Bank v. Graham, 147 Mo. 250, in which the right of parties to agree upon a special judge was held to be dependent upon the regular judge being disqualified. Recurring now to the law as it existed prior to the enactment of section 731, Revised Statutes of 1899 (now sec. 2032, R. S. 1909).

It was settled that an incoming or succeeding judge's only course when called upon to pass upon a motion for a new trial, filed before his predecessor, but not disposed of, was to grant such motion. [State ex rel. v. Walls, 113 Mo. l. c. 45; Woolfolk v. Tate, 25 Mo. 597; Cocker v. Cocker, 56 Mo. 180.] The ground upon which that doctrine was based was that a party to a suit has the same right to have his motion for a new trial heard and duly considered as he has to institute or defend an action, and it is better to allow a new trial where the court for any cause cannot consider the merits of an application for that purpose than to refuse it, otherwise irreparable injury may be done, whereas on the other hand the prevailing party in the verdict will only suffer by delay and generally will secure another verdict if entitled to it. The reason for denying the motions in the circuit court was that the incoming judge had not heard the evidence and could not therefore intelligently pass upon the motion. But in the march of time stenography had come into general use, and the Legislature had provided for official stenographers to take all the evidence and exceptions during the trial and to transcribe the same into long hand, and accordingly the incoming judge has as com-

plete a history of the trial as the judge who tried it
could have had; and to prevent the unnecessary delay
and cost of a new trial, the Legislature at the revising
session of 1889 enacted section 2171 of that revision,
which remains the same today in section 2032, Revised
Statutes of 1909 (sec. 731, R. S. 1899), whereby the in-
coming or succeeding judge or the acting judge of the
court where the case was heard is required to sign the
bill of exceptions, and this was held to carry with it
the coincident right to pass upon the motion for new
trial, without which the power to sign a bill of excep-
tions would be ineffectual. [State ex rel. v. Perkins,
139 Mo. 106; Fehlhauer v. St. Louis, 178 Mo. 653.]
The statute is highly remedial and we have ruled that
it should be liberally construed to effectuate the pur-
pose for which it was enacted. Unless this bill could
be signed by Judge Moore, it is extremely doubtful if
defendant could have had an appeal. In all cases of
felony in which a defendant has been convicted, an ap-
peal to this court is allowed, and where he is unable
to pay the costs of a transcript the statute requires
that the court shall order the same to be furnished and
the stenographer's fees taxed against the State or the
county as may appear. These statutes are in keeping
with the spirit and humanity of the age in which we
live. They are in marked contrast with the English
system which allowed appeals in all civil matters, but
denied them when the life or liberty of the citizen was
at stake. Looking closer into this statute and the
clause of the section under which Judge Moore signed
the bill of exceptions, it was the obvious purpose to
supply a judge in place of the judge who heard the
cause but whose term had expired before he signed the
bill. The act proceeded on the idea that the appellant
was entitled to have his record made up for his appeal,
and as the bill of exceptions was made out and certi-
fied by a sworn officer of the court, the danger of im-
posing a false bill on the succeeding judge, or the act-

ing judge of the court in which the cause had been heard, was reduced to a minimum, especially as opposing counsel are always allowed to make objections and have corrections made. Conceding that, generally speaking, a judge disqualified can take no further step in a case, but that in the absence of a statute like this, would clearly have no authority to sign a bill of exceptions, when the formal and perfunctory nature of the act allowed by this section is considered, there would seem no ground to question the constitutionality of such an act. In this case the disqualification was upon grounds of interest and prejudice against defendant, and as the defendant waived the disqualification and presented the bill to Judge Moore, he, of course, does not challenge the legality of the signing, and we think the State ought not to be heard to complain. The statute is broad, it is true, but without giving it a liberal construction the defendant is practically deprived of his appeal from a conviction of a felony and sentence to the penitentiary. The statute has been in force for more than twenty years and no complaint appears to have been made of an abuse of its provisions. Indeed, in the very nature of things it can rarely be invoked. While ordinarily a disqualified judge can do nothing in a case in which he is disqualified, for the most obvious reasons, yet it is not true that he can do nothing. When a change of venue is granted on account of the prejudice of the judge, the statute imposes upon him the duty of calling in another judge to try the cause and of fixing the time for the trial. Surely the mere act of signing a bill of exceptions already settled and agreed upon is not open to the objections that a defendant might make to a disqualified judge selecting his successor or substitute for the trial of the case. In view of the unqualified terms of the statute and the fact that it was the evident intent of the Legislature to provide a means for every appellant to have his bill of exceptions made a part of the

record and the liberal construction heretofore put upon this section, we have reached the conclusion that Judge Moore, in the circumstances, had the right to sign the bill and make it a part of the record, and the exceptions must be considered.

II. The defendant insists that the evidence will not sustain the verdict and sentence.

The testimony established that the heirs or devisees of one Crocker, a citizen of Massachusetts, owned a considerable quantity of wild and unoccupied timber lands in Stone county of this State. It appears that in 1906 they were desirous of selling these lands. They made an arrangement with James R. Orr of Webb City, Missouri, to inspect the lands and make report of their value. The defendant resided at Galena, the county seat of Stone. Orr had no acquaintance with the lands or their value and he employed defendant to accompany him on an inspection of the lands, which consumed about three weeks of time. Orr made his report to the Crockers and he testified they wrote him they would pay him a liberal commission to sell the lands. This was in November, 1906. Thereupon Orr wrote defendant, Morris, that if the latter would find purchasers, Orr would give him, defendant, two-thirds of his commission. He stated that the arrangement was that defendant was to find the purchaser and fill out applications furnished him by Orr, and Orr would prepare the deeds and send them to the Crockers to execute.

Defendant acting under this arrangement proceeded to get purchasers from December, 1906, till September, 1907, and deeds were made and the trades consummated. On September 16, 1907, Orr wrote defendant that owing to some adverse claim, the Crockers had withdrawn the lands from the market. The state attempted to show that defendant was not authorized to receive any of the purchase money, and Orr

stated he did not authorize him to receive it, but on cross-examination he answered that when the first sale was made he sent the deed to defendant and told him to get the money, but witness did not remember that as to the other deeds he said anything about receiving the money. There was never any trouble about defendant accounting for all that came into his hands up to September 16, 1907. On that date Orr wrote him the letter notifying him of the withdrawal. Prior to that time on February 5, 1907, defendant wrote Orr that one Henry C. Morris, no relation of his, wanted to purchase the southeast quarter of the southeast quarter of section 33, township 24, range 24, and had deposited $50 with defendant, and wanted to pay the balance in one, two and three years, and notified him several others desired to purchase land, and when they got $50 to pay down he would take their applications. Orr wrote the Crockers and they declined to sell the southeast quarter of the southeast quarter on these terms. No complaint was made by Henry Morris that this money was not returned.

The indictment in this case charges the fifty dollars was obtained on the representation that defendant was the agent for the Crockers and had authority to sell the southwest quarter of the southeast quarter of section 33, township 24, range 24, in Stone county, and that H. C. Morris paid him said money by reason of said false representations.

H. C. Morris testified he had been wanting to buy some of the Crocker lands, and heard defendant was the agent, and he came up and bought forty acres on payments $50 down, and then some time after that he looked over the lands and saw some more forties and he made some payments on same and inquired of defendant if he could get the land, and defendant said, "Yes, sir, you can get the land if you pay the money on it, and the land can be made raise the rest

of the money; then the land will be yours without a doubt and you will have the first refusal.'' Thereupon he says he paid $50 on the southwest quarter of the southeast quarter in February, but never paid the remaining $50. The witness was illiterate and could not read, and it is exceedingly doubtful what forty he referred to, but he answered in response to the prosecuting attorney's question and · that referred to the southwest quarter of the southeast quarter; but· one thing seems clear, that the forty acres he paid on was not the forty on which the $50 was paid by his wife at a subsequent date, and which forms the basis for this prosecution, and all that evidence should have been excluded. It simply confused the jury and the court in getting at the case stated in the indictment. He finally stated he sent his wife to purchase.

She testified that on the 14th of October, 1907, she went to Galena on her way to Oklahoma and paid defendant $50 on the southwest quarter of southeast quarter of section 33, township 24, range 24, in Stone county, for her husband, for the Crockers. She testified to paying defendant the $50 on that date. He represented himself to be the agent of the Crockers to sell this land in August, 1907. That he would send the money and the Crockers would make the deed. These statements were made in August, 1907. She had a slight memory of hearing that defendant was dealing with the land through another agent in Jasper county. She drew the $50 out of the bank, and paid defendant under the instruction of her husband. Defendant stated that when all the amount of the contract price was paid in on the land, her husband would get his deed. The Crockers were to make the deed. H. C. Morris never tendered the balance of the purchase money. The only representation he made was that he would get them a deed when the money

was all paid in. She also testified her husband was to get the balance of the money out of ties to be made from the timber on the land. H. C. Morris proceeded after paying the $50 to cut the timber and make cross-ties until the latter part of October, 1907, when the agents of the Crockers went upon the land and marked the cross-ties and notified H. C. Morris that he had no title, and defendant was not authorized to sell or permit him to make the ties.

Henry C. Morris testified that after the agents of the Crockers took possession of the ties he went to Galena and talked to the defendant about purchasing this particular forty acres, and defendant said it was for sale, and that was about all that he said at that time, and he told the defendant he wanted this forty and would be back again and see about it, and later he told his wife to buy it. He could not fix the date when he had this conversation with defendant about this particular tract.

S. A. Johnson testified for the State that he was present in defendant's office in Galena after the ties had been branded and claimed by the Crockers when Henry C. Morris had a talk with the defendant, and Henry told the defendant he thought he ought to pay him his money back as he could not get his deed, and the defendant told him he would not have any talk about it because "you fellows are not going to get me to say anything to convict myself." He seemed to think that the witness and Henry Morris were endeavoring to get testimony against him.

C. B. Swift for the State testified to a conversation he had with the defendant in 1907, and defendant told him he was only acting under another agent at Webb City. He spoke about the parties making ties on this land and that he would like to get more authority so he could stop people from cutting the timber.

The defendant testified in his own behalf and

stated that in September, 1907, H. C. Morris came to see him about this forty acres, and defendant told him he had just received a letter saying the land was off of the market, and that he thought he wrote Morris a letter and told him as well as he could, and Morris came to see him and said: "Well, I want that forty that is right in front of my house and joining my land, and I want to pay you some money on that land to hold it so when it comes on the market I can get it." To which defendant replied: "I guess that will be all right," and along in October Morris's wife came and said that Henry had sent $50 by her, and he took the money and gave her the following memorandum: "Galena, Mo., 10|14, 1907, Received of H. C. Morris $50.00 on southwest quarter of southeast quarter of section 33, 24, 24. H. W. Morris." Afterwards when Morris came to see him about it at the time they had arrested the defendant, he commenced talking about it and he told Morris: "Well, you know how the thing stands, you know I never sold that land, it is off the market and you know I told you not to cut ties on that land. I wrote you and then hired a team and came out to your house and you told me you had not cut a tie on that land, and if you had cut it it was your fault, and I told him I would not pay any money back. He only paid me the money he had, to hold." He testified that he was selling this land under Mr. Orr. The arrangement was that he was to find purchasers and send in the names to Orr and Orr would send the deed to the Crockers and when it was executed he would send it to the defendant and defendant was to collect the money and send it to Orr; after that Orr would send the deed to a bank and the cashier of the bank would pay defendant his commission there. All of his transactions in reference to the sale of the land were approved except two applications he sent in for selling on time, which the Crockers turned down. He testified positively that he never gave Morris any

authority to cut timber on the land.  He testified that he told Morris that this tract was off the market, but when it came back on the market he would give him the first choice.  That he received the $50 from Morris to hold him that piece.

Charles Racliff testified for the defendant that he knew H. C. Morris and the defendant, and was present during the conversation when Morris wanted the defendant to pay back some money he had paid him.  When he asked for the money defendant told him: ''No, our contract was, when you pay the balance of the money and the land came back on the market, I was to fulfill my part of the contract.''  In that conversation, H. C. Morris admitted that he knew when he paid the $50 that the land was off the market, but he said he thought he had the right to cut the ties, but had been stopped, and as he could not go on cutting the ties he ought to have his money back.  But the defendant stated, ''The agreement was, you pay me this much money on the property and it was off the market, and when it comes back on the market, you are to have the first call, that was our understanding.''

That the defendant's representations that he was the agent of the Crockers for the sale of this land were true at the time he made them in February, 1907, and up to September 16, 1907, is established by the testimony of the State.  Mr. Orr's testimony on this point leaves no doubt whatever.  The negotiations for the purchase of the southwest quarter of the southeast quarter of section 33, township 24, range 24, began in the month of August, 1907, and at that time the defendant was the agent for the sale of this land.

Mrs. Laura Morris's testimony discloses that the defendant made no representation whatever as to the agency at the time she paid the fifty dollars for her husband.  She testified that the only representation he made at the time she paid him the money was that he would get them a deed when the money was all paid in.

And Henry C. Morris himself testified that when he began to negotiate for this particular forty acres the defendant said it was for sale, and that was about all that was said at that time. He was not present when his wife paid the fifty dollars for him. When Henry C. Morris, after making the agreement with the defendant that he was not to have a deed to this land until he had paid the whole purchase money, went upon the land and commenced to make cross-ties out of the timber thereon and was stopped by the agents of the Crockers, he went to the defendant and demanded his money back or a deed. He knew he was not entitled to a deed because he had never paid the remainder of the purchase money or tendered it and therefore he demanded a return of his money. Conceding that the defendant ought in law and in good morals to have returned the money, still the evidence falls far short of proving that he had obtained the money from Morris and his wife by means of any false and fraudulent representations made at that time. Nor will the fact that he had previously represented that he was the agent and authorized to sell the land, when he was in fact so authorized, attach itself to the subsequent transaction made after the Crockers had taken the land off of the market so as to make him guilty of having obtained the fifty dollars by means of false and fraudulent representations as alleged in the indictment. Clearly he was not guilty if, as his testimony and that of other witnesses tends to prove, he had advised H. C. Morris that the land was then off the market and Morris knowing this relied upon the defendant's promise to obtain him the deed when he had paid for the whole tract when the land was subsequently put on the market by its owners. This was a promise. The very essence of the offense of obtaining money or property by means of false and fraudulent representation is that the money or property must be obtained or the fraud effected by means of the false pretense. And as no representations were made to the

prosecuting witness by the defendant after the lands had been taken off the market, it seems to us that the State wholly failed to establish the essential element of the crime, to-wit, the false and fraudulent representation by which Morris was induced to give up his money. Had the previous representations made as to his agency and his right to sell prior to the 16th of September, 1907, been false and fraudulent, instead of having been true, as was established by the State, and the dealings between Morris and the defendant had continued upon the faith of those false and fraudulent representations, the offense might have been established, but as the representations were true at the time they were made and were not repeated after the lands were taken off of the market, but Morris and the defendant dealt with each other simply upon the assumption that defendant could procure a deed if Morris paid the full price of the land when it should later be put upon the market, the case simply becomes one of money paid to the use of Morris, which defendant had no right to receive, and was bound to return to Henry C. Morris upon demand. But it falls far short of the criminal offense of obtaining money under false and fraudulent pretenses. In fact it was a case simply of Henry Morris relying upon a promise of the defendant to obtain a deed for him in the future and was not a false and fraudulent representation of an existing fact upon which he was authorized to rely and part with his money. While the defendant should have returned the money to Morris upon his demand, it was simply a breach of a civil liability and not a crime of obtaining money under false and fraudulent pretenses.

While, of course, in the discussion of this matter, the failure of the State's evidence alone can properly be considered, it would appear that Henry Morris himself was not entirely without fault. According to his own testimony, that he was not to have this land until he had paid the full purchase price therefor, he had no

right to cut and destroy the timber thereon.   The transcript abounds in testimony that his purpose in making these preliminary partial payments was to enable him to cut timber and make cross-ties thereof, so that he might pay for the land out of the timber.   His testimony established no such right under his agreement with the defendant and the defendant's testimony shows that he warned him not to cut the timber.

After a full consideration of the testimony in this case we have reached the conclusion that the testimony wholly failed to establish the essential elements of the crime with which the defendant was charged.

The judgment must be and is reversed and the defendant discharged.   *Burgess* and *Kennish, JJ.,* concur.