THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* BALBINO CRUZ RIVERA, Defendant and Appellant.

No. 10679. Argued May 8, 1945.—Decided June 25, 1945.

*Santos P. Amadeo* and *G. Concepción de Gracia* for appellant. *R. A. Gómez, Prosecuting Attorney (Fiscal)*, and *Luis Negrón Fernández, Assistant Prosecuting Attorney*, for appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the court.

The appellant was sentenced to life imprisonment for the crime of murder in the first degree. He bases this appeal on the error which he alleges was committed by the lower court in refusing to admit evidence as to the dangerous and quarrelsome character of the victim. The court grounded its decision on the fact that in order for that evidence to be admissible, it was necessary for the defendant to have personally admitted having killed the deceased, it not being sufficient that counsel for the defense, upon presenting the case to the jury, should have stated that the defendant had killed the victim, and notwithstanding that defendant's evidence tended to establish a case of self-defense.

The discussion of the alleged error requires an examination of the transcript of the evidence; but since the record on appeal discloses that the transcript was certified by the successor of the judge who presided at the trial, and the *Fiscal* of this court has moved for the dismissal of the appeal precisely for that reason, we must dispose of the motion to dismiss before passing upon the merits of the case.

■ Prior to Act No. 4 of April 18, 1925 (Laws of 1925, p. 108), the procedure for sending up to this court the evidence introduced in a criminal action was governed by § 298 of the Code of Criminal Procedure. That Section provided for the presentation of the statement of the case which had to be certified by the judge who presided at the trial. If before the approval of the statement of the case the judge ceased to hold office, this circumstance did not deprive him of his authority to certify it, and if he failed to do so, the party could apply to the Supreme Court to settle and approve it. So in no case the successor of the judge who presided at the trial had jurisdiction to approve the statement of the case.

But as we have already pointed out, the procedure for sending up the evidence to this court was modified by Act No. 4 of 1925, amending § 356 of the Code of Criminal Procedure. The new Act permitted the appellant to send up the evidence either by a statement of the case or by a transcript of the stenographic record. This Act made no provision for the event in which the judge who presided at the trial ceased in office before certifying the statement of the case or the transcript of the evidence, nor did it confer jurisdiction on this court to certify it if said judge should, for any reason, fail to do so, as was provided by said § 298. On the other hand, it provided that upon the filing of the statement of the case or the transcript of the evidence with the clerk of the court *a quo* he shall report the fact to the judge—without specifying that it should be the judge who presided at the trial, as described by § 298—and the judge shall set the date for the appearance before him of the defendant or his attorney and of the district attorney for the approval of the statement of the case or transcript of the evidence.

The failure to provide in the Act of 1925 that the statement of the case or transcript of the evidence should in any event be approved by the judge who presided at trial; the failure to grant jurisdiction to said judge to approve them after having ceased in office; the failure to vest this court with jurisdiction to approve them when the judge who presided at trial fails to do so, as was provided in § 298, and lastly, the failure to deprive the successor of the judge of that power, in our opinion indicate that it was the legislative intent that when the judge who presided at trial ceased in office for any reason, that duty devolved on his successor, like any other matter left pending by the former judge. If the Supreme Court, which is in no better position than the successor of the judge who presided at trial, could under § 298, in he above-mentioned circumstances, approve and certify the statement of the case, we do not see why, under the

law in force, the successor of the judge could not, as part of his duty, approve the statement of the case or transcript of the evidence.

*People* v. *Poll,* 18 P.R.R. 355 (1912), and *People* v. *Collado,* 33 P.R.R. 114 (1924), invoked by the *Fiscal* in support of his contention that the successor of the judge who presided at trial lacks jurisdiction to approve the transcript of the evidence are inapposite, for they were decided when § 298 of the Code of Criminal Procedure prevailed. No light is shed either by *State* v. *Morris,* 132 S.W. 590 (Mo., 1910), invoked by the appellant in opposition to the *Fiscal's* theory, for that case was decided, as to the particular point under discussion, under a Missouri statute which expressly authorized the successor of the judge who presided at the trial to certify the statement of the case left pending for approval by the former judge.

The successor of the judge who presided at trial being vested with jurisdiction to approve the transcript of the evidence, the motion for dismissal must be denied. The conclusion at which we have just arrived, brings us to the merits of the case.

 The record discloses that when the case was presented to the jury, counsel for the defense stated that the defendant admitted having killed the victim, but that he had done so in self-defense.

The theory of the district attorney was to the effect that the deceased had been for an hour and a half sitting on a chair near one of the two doors of the kiosk El Jockey in Comerío Street, in Bayamón, talking with two friends; that the defendant who had been standing near the other door of the kiosk for a half hour without saying one word, pulled out his revolver and fired one shot at the deceased; that the latter instantly got up and took two or three steps towards the defendant, who fired a second shot from a distance of three feet and that the victim immediately fell.

The theory of the defense was to the effect that on the day of the occurrence the defendant entered the kiosk El Jockey, that at that moment the victim was drinking a glass of *"mavi,"* and that when he saw the defendant he tossed the glass and made a gesture as if to pull out a weapon (one of the witnesses testified that he saw a knife), walking toward the defendant; that the latter walked back until he reached the street and from there fired the deadly shots.

In addition to this evidence the defendant presented another witness who testified that he had known the defendant and the victim for about ten or twelve years; that both were old friends of his, born in the same town, and that they had served sentence together;[1] that both visited his kiosk called La Reforma; that when the defendant came out of jail he had illicit relations with the concubine of the deceased; that the latter knew of these relations and three days prior to the murder told the witness that between him (the deceased) and the defendant, something serious was going to happen; that either he would kill the defendant or the defendant would kill him; that the witness told the defendant about this, and begged the defendant as well as the victim to stay away from the kiosk.

Another witness for the defendant testified that on the morning of the crime he met the victim, who was going past the house of the defendant; that the latter was on the porch and the victim called him and asked him for a chain which belonged to the victim's concubine and was being kept by the defendant; that a discussion ensued and noting that the victim carried a knife, the witness took the defendant away from the place, thus avoiding a conflict between them.

As may be seen the defendant presented to the jury a case of self-defense.

The evidence offered by the defendant to show the dangerous and quarrelsome character of the victim was (1) the testimony of the owner of "La Reforma," whom the defense

---

[1] These sentences, as we shall see further, were for crimes of violence.

questioned as to the deceased's character, and if he knew of acts of aggression performed by him, and (2) the testimony of Balbino González Montalvo, Warden of the District Jail of San Juan, who presented the victim's record in order to prove that at different occasions the deceased had committed crimes of violence for which he had been sentenced; that he had a lengthy penal record and was a dangerous person. This evidence was objected by the district attorney and the court sustained the objection.

The ground on which the lower court refused to admit this evidence was manifestly erroneous. To maintain that this evidence was inadmissible because the defendant had not personally admitted having killed the victim is tantamount to depriving the defendant of his right to refuse to testify. If the defendant, through his attorney, upon presenting the case to the jury, admitted having killed the victim, this admission bound the defendant equally as if he had done so in person.

But the fact that the ground for denying the admission of this evidence was erroneous, does not relieve us from the duty of determining whether the evidence offered by the defense was admissible, for if it were not, then the error would be harmless and in that event the judgment should be affirmed.

The penal record of the victim and the question put to the owner of the kiosk La Reforma as to whether he knew of acts of aggression committed by the deceased, would have tended to prove the character of the victim by specific acts. ██ The issue in this case being the determination of whether the murder was committed in self-defense, were the specific acts which the defendant intended to prove admissible in evidence?

There is a marked difference of opinion among the authorities on this question. According to the orthodox rule still prevailing in many jurisdictions, in order to prove the dangerous and quarrelsome character of the victim, the only

evidence that may be admitted is about the reputation of the person as quarrelsome and dangerous in the community where he lived, excluding specific acts of violence or crimes committed by said person, it being necessary prior to the admission of the evidence on reputation, to introduce substantial evidence tending to show that the defendant knew of this reputation at the time of the quarrel.

But under the modern rule prevailing in most jurisdictions, evidence of specific acts of the victim is admissible when the issued involved is self-defense, in these two cases: (1) when there is conflict as to the question of whether the defendant or the victim was the aggressor; and (2) when the defendant tries to prove that when he killed the victim he had real or apparent reason to believe—considering the dangerous character of the victim—that upon being attacked by the latter he was in imminent danger of losing his life or of receiving serious bodily injury. As to the first hypothesis it seems clear if it is shown that the victim on previous occasions had a proneness to commit such acts of violence, this tendency would constitute a circumstance to be considered by the jury with the rest of the evidence, with a view to determining which of the two, the victim or the defendant, was the aggressor. Under this theory it is not necessary for the defendant to prove that he had knowledge of acts of violence prior to the incident. 1 Wigmore on Evidence (3d ed., 1940), §§ 63 and 198, pp. 467 *et seq.* and 676 *et seq.; State* v. *Blee,* 133 Iowa 725 (1907); *Burford* v. *Commonwealth,* 20 S.E. (2d) 509 (Va., 1942); *State* v. *Waldron,* 75 S. E. 558 (W. Va., 1912); 25 Calif. L. Rev. 459; 1 Wharton's Criminal Evidence, §§ 324 *et seq.* See also *Allison* v. *United States,* 160 U. S. 203 (1895); *Wiggins* v. *People, etc., in Utah,* 3 Otto. 465 (U.S., 1876); *Winner* v. *State,* 125 A. 397 (Md., 1924); 73 U. of Pa. L. Rev. 79.

As to the second theory it is indispensable to establish, prior to the introduction of the evidence of said specific acts of violence, that the defendant had knowledge of those acts

at the time of his quarrel with the victim. ¹2 Wigmore, *op cit.*, § 248, pp. 61 *et seq.*, § 246, pp. 44 *et seq.; State* v. *Gordon,* 181 A. 361 (Del., 1935); *McKee* v. *State,* 154 N.E. 372 (Ind., 1926); *State* v. *Wilson,* 17 N.W. (2d) 138 (Iowa, 1945); *Jones* v. *State,* 35 A. (2d) 916 (Md., 1944); *Jackson* v. *State,* 147 S. W. (2d) 1078 (Tex., 1940); *Beckham* v. *State,* 109 S. W. (2d) 764 (Tex., 1937); *State* v. *Walker,* 115 S.E. 443 (W. Va., 1922); 121 A.L.R. 390. Cf. *Preston* v. *United States,* 80 F. (2d) 702, 703 (1935).

With reference to the admissibility of evidence of specific acts, Professor Wigmore states:

"The state of the law has come on the whole to favor the admissibility of such facts.

"Nevertheless, in the majority of jurisdictions, such evidence was, for a long time, absolutely excluded. In some instances this was probably due to a notion that the deceased's character is sought objectively to be shown by particular acts . . . ; but the real purpose is merely to show conduct as would naturaly excite apprehension, whether it objectively indicates a fixed trait of character or not. Certainly an analogies of the law (apart from the common sense of the situation) favor such evidence; for if particular vicious acts of an animal are relevant to show that its owner was warned of its viciousness . . . , and if particular misconduct of an employee is relevant to show that his employer was warned of his incompetency . . . , then particular deeds of unscrupulous violence may well be deemed relevant to show an apprehension of violence from such a person. The true solution is to exercise a discretion, and to admit such facts when common sense tells us that they could legitimately affect a defendant's apprehension." 2 Wigmore, *op. cit.*, § 248, p. 65.

And in another volume of his works, the author states:

"When the turbulent character of the deceased, in a prosecution for homicide, is relevant . . . , there is no substantial reason against evidencing the character by *particular instances* of violent or quarrelsome *conduct.* Such instances may be very significant; their number can be controlled by the trial Court's discretion; and the prohibitory considerations applicable to an accused's character . . . have here little or no force." 1 Wigmore, *op. cit.*, § 198, p. 676.

We have no doubt that this doctrine rests on principles of logic and is supported, as we have indicated, by a weight of authority on the continent. But for the purposes of this jurisdiction, it does not seems wise to adopt it to its full extent. Justice is better served by limiting the admission of specific acts to prior convictions for crimes of violence. In this way is met the challenge made against this doctrine in the sense that the admission of specific acts would give the opportunity of bringing to trial collateral questions which would unnecessarily protract the trial and at the same time distract the attention of the jury from the real issue in controversy.

This evidence of convictions may be presented in both kinds of cases above-referred to, that is: (*a*) when a controversy arises as to whether the defendant or the deceased was the aggressor, and (*b*) when the defendant tries to prove that he had reason to believe, upon being attacked by the victim, that the latter was a dangerous enemy. Of course, if the defendant tries to establish crimes of violence committed by the victim, the Government may offer evidence to establish convictions of like nature on the part of the defendant. 1 Wigmore, *op. cit.,* § 63, p. 472.

In the present case the evidence to the effect that the deceased had served sentences for crimes of violence at the same time that the defendant served sentences in the same jail, especially when from the evidence it appears that they were friends prior to their commitment in the district jail and during their confinement, rationally establishes that the defendant at the time of the affray had knowledge of the convictions of the deceased for crimes of violence. Thus, the evidence of the penal record of the victim offered by the defendant in order to establish that when he met the deceased at the time of the affray the defendant had reason to believe that he was encountering a dangerous enemy, was admissible.

Inasmuch as in the present case the issue in controversy was as to which one was aggressor, the evidence of the convictions was likewise admissible for that purpose.

The evidence of the convictions of the victim being admissible under either theory, the lower court committed prejudicial error in refusing to admit in evidence the penal record of the deceased and, therefore, the judgment must be reversed and the case remanded to the lower court for a new trial.