EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* BALBINO CRUZ RIVERA, acusado y apelante.

Núm. 10679.—*Sometido:* Mayo 8, 1945.   *Resuelto:* Junio 25, 1945.

*Santos P. Amadeo* y *G. Concepción de Gracia,* abogados del apelante; *R. A. Gómez, Fiscal del Tribunal Supremo,* y *Luis Negrón Fernández, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

El apelante fué sentenciado a reclusión perpetua por un delito de asesinato en primer grado. Basa este recurso en el error que imputa a la corte inferior al no haberle permitido presentar evidencia del carácter peligroso y pendenciero de la víctima. La corte fundó su resolución en que para que esa evidencia fuese admisible, precisaba que el acusado en persona hubiese admitido haber dado muerte al interfecto, sin que bastara que el abogado defensor al presentar el caso al jurado hiciera constar que el acusado había dado muerte a la víctima, y no obstante haberse presentado evidencia tendente a establecer un caso de defensa propia.

La discusión del alegado error requiere un examen de la transcripción de evidencia, pero como del récord en apelación resulta que la transcripción fué certificada por el sucesor del juez que presidió el juicio, y el fiscal de este Tribunal ha solicitado la desestimación del recurso precisamente por ese motivo, es necesario resolver la moción del fiscal antes de entrar a considerar los méritos del recurso.

Hasta que se aprobó la Ley núm. 4 de 18 de abril de 1925 (pág. 109), el procedimiento para elevar al Tribunal Supremo la evidencia presentada en una causa criminal estaba regulado por el art. 298 del Código de Enjuiciamiento Criminal. Ese artículo sólo permitía la presentación de una exposición del caso, que debía ser certificada por el juez que presidió el juicio. Si antes de aprobar la exposición del caso el juez cesaba en el ejercicio de su cargo, esa circunstancia no le privaba de la facultad de aprobarla, y si dejaba de hacerlo podía la parte recurrir a la Corte Suprema para que la resolviera y aprobara. De suerte que en ningún caso el sucesor del juez que presidió el juicio tenía facultad para aprobar la exposición del caso.

Pero como ya hemos anticipado, el medio de elevar la evidencia al Tribunal Supremo fué modificado por la Ley

núm. 4 de 1925, enmendatoria del art. 356 del Código de Enjuiciamiento Criminal. La nueva Ley concedió al apelante la opción de elevar la prueba mediante una exposición del caso o de hacerlo mediante la transcripción de evidencia preparada por el taquígrafo. Esta Ley nada dispuso para el caso de que el juez que presidió el juicio cesara en el ejercicio de su cargo antes de certificar la exposición del caso o la transcripción de evidencia, ni concedió jurisdicción a este Tribunal para certificarla si el referido juez por cualquier causa dejase de hacerlo, conforme proveía el art. 298. En cambio, dispuso que una vez archivada en la secretaría de la corte la exposición del caso o la transcripción de evidencia, el secretario dará cuenta de ello al juez—sin especificar que fuera al juez que presidió el juicio, como lo hacía el art. 298—y el juez fijará la fecha en que ante él deberán comparecer el acusado o su abogado y el fiscal del distrito para la aprobación de la exposición del caso o de la transcripción de evidencia.

El no disponer la Ley de 1925 que la exposición del caso o la transcripción de evidencia deberán necesariamente ser aprobadas por el juez que presidió el juicio; el no concederle jurisdicción a dicho juez para aprobarlas después de haber cesado en el ejercicio de su cargo; el no conceder a la Corte Suprema jurisdicción para aprobarlas cuando el juez que presidió el juicio dejare de hacerlo, como se disponía en el art. 298, y por último, el no haber prohibido esa facultad a su sucesor, indica a nuestro juicio que fué la intención legislativa. que al cesar por cualquier causa en el ejercicio del cargo el juez que presidió el juicio, ese deber recayese sobre su sucesor, como cualquier otro asunto que el anterior juez hubiese dejado pendiente de terminación. Si el Tribunal Supremo, que no está en mejores condiciones que el sucesor del juez que presidió el juicio, podía bajo el art. 298, en las circunstancias ya expresadas, aprobar y certificar la exposición del caso, no vemos por qué, bajo la ley vigente, el

sucesor del juez no pueda como parte de sus deberes aprobar la exposición del caso o la transcripción de evidencia.

Los casos de *El Pueblo* v. *Coll,* 18 D.P.R. 361 (1912), y *Pueblo* v. *Collado,* 33 D.P.R. 118 (1924), invocados por el fiscal para sostener que el sucesor del juez que presidió el juicio carece de jurisdicción para aprobar la transcripción de evidencia, no tienen aplicación al presente caso, pues fueron resueltos cuando regía el art. 298 del Código de Enjuiciamiento Criminal. Tampoco arroja luz en esta discusión el caso de *State* v. *Morris,* 132 S. W. 590 (Mo., 1910), invocado por el apelante en oposición a la tesis del fiscal, pues ese caso fué resuelto, en cuanto al punto que discutimos, por un estatuto del Estado de Missouri que expresamente autorizaba al sucesor del juez que presidió el juicio para certificar la exposición del caso que hubiere quedado pendiente de aprobación por su antecesor.

Teniendo el sucesor del juez que presidió el juicio jurisdicción para aprobar la transcripción de evidencia, procede denegar la moción de desestimación presentada por el fiscal. Esta conclusión nos conduce a la consideración del caso en sus méritos.

Los autos revelan que al presentar su caso al jurado, la defensa expresó que el acusado admitía que había dado muerte a la víctima, pero que lo había hecho en defensa propia.

La teoría del fiscal fué al efecto de que el interfecto hacía hora y media que se hallaba sentado en una silla hablando con dos amigos cerca de una de las dos puertas del cafetín El Jockey, en la calle Comerío de Bayamón; que el acusado hacía media hora se hallaba de pie junto a la otra puerta del cafetín, y sin que mediaran palabras, sacó un revólver e hizo un disparo contra el interfecto; que éste rápidamente se levantó y anduvo dos o tres pasos, hacia donde estaba el acusado, quien le hizo un segundo disparo a una distancia de tres pies, e inmediatamente cayó la víctima.

La de la defensa fué al efecto de que el día de autos el acusado penetró en el cafetín El Jockey; que en esos momentos la víctima estaba tomando un vaso de maví, y al ver al acusado tiró el vaso e hizo un ademán de sacar un arma (uno de los testigos dice que le vió un cuchillo), dirigiéndose hacia el acusado; que éste retrocedió hasta llegar a la calle, y de allí le hizo los disparos fatales.

En adición a esta prueba el acusado presentó otro testigo, quien declaró que hacía más de diez o doce años que conocía al acusado y a la víctima; que los dos eran viejos amigos, que eran del mismo pueblo, y habían extinguido condenas juntos;(1) que ambos frecuentaban su cafetín denominado La Reforma; que al salir el acusado de la prisión entabló relaciones ilícitas con la querida del interfecto; que éste tuvo conocimiento de esas relaciones, y tres días antes del suceso le dijo al testigo que entre él (el interfecto) y el acusado habría de suceder algo grave: que él mataría al acusado, o el acusado lo mataría a él; que el testigo puso en conocimiento del acusado estas manifestaciones, y suplicó tanto al acusado como a la víctima que hicieran lo posible por no visitar su cafetín.

Otro testigo de la defensa declaró que en la mañana del día en que ocurrió el suceso se encontró con la víctima, quien pasaba frente a la casa del acusado, y hallándose éste en el balcón, la víctima lo llamó, requiriéndole para que le entregara una cadena que decía que el acusado tenía y que pertenecía a la querida de la víctima; que se inició una discusión entre ellos, y el testigo, observando que la víctima portaba un cuchillo, se llevó del sitio al acusado, de ese modo evitando un conflicto entre ellos.

Como podrá verse, el acusado presentó a la consideración del jurado un caso que envolvía la defensa propia.

La evidencia que ofreció el acusado para demostrar el carácter peligroso y pendenciero de la víctima fué (1) el

---

(1) Estas condenas, como veremos más adelante, eran por delitos de sangre.

testimonio del dueño del cafetín La Reforma, a quien la defensa preguntó qué clase de persona era el interfecto, y si tenía conocimiento de actos de agresión por él realizados, y (2) la declaración de Balbino González Montalvo, alcaide de la cárcel de distrito de San Juan, con el récord de la víctima, con el fin de probar que en distintas ocasiones el interfecto había realizado delitos de sangre por los cuales fué sentenciado, que tenía un extenso récord penal y era persona de carácter peligroso. Objetada esta evidencia por el fiscal, la corte sostuvo la objeción.

El fundamento que expresó la corte inferior para no admitir esa evidencia es manifiestamente errónea. Sostener que esa prueba es inadmisible porque el acusado en persona no había admitido haber dado muerte a la víctima, equivale a privar al acusado del derecho que tiene de abstenerse de declarar. Si el acusado por medio de su abogado, al presentar el caso al jurado, admitió haber dado muerte a la víctima, esa admisión obligaba al acusado lo mismo que si él en persona la hubiera hecho.

Pero el hecho de que el fundamento de la resolución negándose a admitir esa evidencia fuera erróneo, no nos releva del deber de determinar si la evidencia ofrecida por la defensa era admisible, pues en caso de no serlo, el error no perjudicaba los derechos del acusado, y consecuentemente procedería la confirmación de la sentencia.

El récord penal de la víctima y la pregunta que se le hizo al dueño del cafetín La Reforma sobre si tenía conocimiento de actos de agresión realizados por el interfecto, hubieran tendido a probar el carácter de la víctima mediante actos específicos.

Estando envuelta en este caso la determinación de si la muerte fué causada en defensa propia, ¿eran admisibles en evidencia los actos específicos que el acusado se proponía probar?

Existe una marcada discrepancia entre las autoridades sobre esta cuestión. La regla ortodoxa que aún prevalece

178

en muchas jurisdicciones únicamente permitía, para probar el carácter pendenciero y peligroso de la víctima, la evidencia sobre la reputación como persona pendenciera y peligrosa dentro de la comunidad en que vivía, con exclusión de actos específicos de violencia o crímenes realizados por dicha persona, debiendo como condición precedente a la admisión de la prueba sobre reputación, presentarse evidencia sustancial tendente a demostrar que el acusado tenía conocimiento de esa reputación al tiempo del encuentro.

Pero la regla moderna en la mayoría de las jurisdicciones admite la prueba de actos específicos de la víctima cuando está envuelta la defensa propia, en dos casos distintos: (1) cuando está en controversia la cuestión de si la agresión partió del acusado o de la víctima; y (2) cuando el acusado trata de probar que al dar muerte a la víctima tenía motivo real o aparente para creer—considerando el carácter peligroso de la víctima—que al ser atacado por ésta se hallaba en inminente peligro de perder su vida o recibir grave daño corporal. En cuanto al primer caso, parece claro que si la víctima ha demostrado en ocasiones anteriores que era propensa a realizar tales actos de violencia, esa propensión constituiría una circunstancia a ser considerada por el jurado con el resto de la prueba, a los efectos de determinar cuál de los dos, la víctima o el acusado, había iniciado el combate. Bajo este primer caso, no es necesario que el acusado pruebe que tenía conocimiento de esos actos de violencia con anterioridad al encuentro. 1 Wigmore *on Evidence* (tercera ed., 1940), secs. 63 y 198, págs. 467 *et seq.* y 676 *et seq.; State* v. *Blee,* 133 Iowa 725 (1907); *Burford* v. *Commonwealth,* 20 S.W. 2d 509 (Va., 1942); *State* v. *Waldron,* 75 S. E. 558 (W. Va., 1912); 25 Calif. L. Rev. 459; 1 Wharton's *Criminal Evidence,* sec. 324 et seq. Véanse además *Allison* v. *United States,* 160 U. S. 203 (1895); *Wiggins* v. *People, etc., in Utah,* 3 Otto. 465 (U. S., 1876); *Winner* v. *State,* 125 Atl. 397 (Md., 1924); 73 U. of Pa. L. Rev. 79.

, En cuanto al segundo caso, es indispensable establecer previamente a la presentación de la prueba de tales actos específicos de violencia, que el acusado tenía conocimiento de ellos al tiempo de su encuentro con la víctima. 2 Wigmore, *op. cit.*, sec. 248, pág. 61 *et seq.*, sec. 246, pág. 44 *et seq.*; *State* v. *Gordon*, 181 Atl. 361 (Del., 1935); *McKee* v. *State*, 154 N. E. 372 (Ind., 1926); *State* v. *Wilson*, 17 N. W. 2d 138 (Iowa, 1945); *Jones* v. *State*, 35 A. 2d 916 (Md., 1944); *Jackson* v. *State*, 147 S. W. 2d 1078 (Tex., 1940); *Beckham* v. *State*, 109 S. W. 2d 764 (Tex., 1937); *State* v. *Walker*, 115 S. E. 443 (W. Va., 1922); 121 A.L.R. 390. *Cf. Preston* v. *United States*, 80 F. 2d 702, 703, (1935).

Refiriéndose a la admisibilidad de evidencia de actos específicos, dice el Profesor Wigmore:

"El estado actual de la ley en términos generales favorece la admisibilidad de tales actos.

"Sin embargo, en la mayoría de las jurisdicciones esa evidencia fué durante largo tiempo absolutamente excluída. En algunos casos, esto se debía a que se trataba de probar el carácter del interfecto objetivamente por actos específicos . . . ; pero el verdadero propósito de esa evidencia es meramente demostrar una conducta tal que naturalmente hubiera producido aprensión, bien indicara objetivamente un rasgo permanente del carácter o no. Sin duda, ciertas analogías en la ley (aparte de lo que el sentido común indica) favorecen la admisibilidad de esa evidencia; porque si actos nocivos específicos de un animal son pertinentes para demostrar que su dueño tenía conocimiento de sus resabios (*viciousness*) . . . , y si un acto específico de mala conducta de un empleado es pertinente para demostrar que su patrono tenía conocimiento de su incompetencia . . . , entonces, actos específicos de inescrupulosa violencia muy bien pueden considerarse pertinentes para demostrar aprensión de ser atacado por esa persona. La verdadera solución consiste en ejercitar discreción y admitir tales actos específicos cuando el sentido común nos indique que pudieron legítimamente producir aprensión en el acusado." 2 Wigmore, *op. cit.*, sec. 248, pág. 61.

Y en otra parte de su obra, dice el autor:

"Cuando el carácter turbulento del interfecto, en un juicio por homicidio [*homicide,* vocablo genérico que en inglés incluye el ase-

sinato], es pertinente . . . , no hay razón sustancial que impida probar el carácter presentando evidencia de actos específicos de conducta violenta o pendenciera. Tales actos específicos pueden ser muy significativos; el número de ellos que pueda presentarse puede ser controlado discrecionalmente por la corte; y las consideraciones que se exponen para rechazar esa evidencia . . . tienen poca o ninguna fuerza persuasiva.'' 1 Wigmore, *op. cit.*, sec. 198, pág. 676.

No abrigamos duda de que la doctrina que acabamos de exponer descansa sobre principios de lógica y está sostenida, como hemos indicado, por la mayoría de las autoridades en el continente. Pero a los efectos de esta jurisdicción, no parece sabio adoptarla en toda su extensión. Se sirven mejor los fines de la justicia limitando la admisión de actos específicos a la prueba de convicciones por delitos de sangre. De ese modo se destruye la objeción que a esta doctrina se ha levantado, en el sentido de que la admisión de actos específicos daría lugar a traer al juicio cuestiones colaterales que prolongarían innecesariamente los juicios, a la vez que distraerían la atención del jurado sobre la verdadera cuestión en controversia.

Esta prueba de convicciones podrá presentarse en las dos clases de casos a que nos referimos anteriormente, es decir: (*a*) cuando está en controversia cuál de los dos, el acusado o la víctima, inició el combate, y (*b*) cuando el acusado trate de probar que tenía motivos para creer al ser atacado por la víctima que se hallaba frente a un enemigo peligroso. Claro es que si el acusado trata de probar crímenes de sangre cometidos por la víctima, el Pueblo puede presentar evidencia para probar convicciones de la misma clase por parte del acusado. 1 Wigmore, *op. cit.*, sec. 63, pág. 472.

En el presente caso la prueba de que el interfecto había extinguido condenas por delitos de sangre al mismo tiempo que el acusado extinguía sentencias en la misma institución penal, especialmente cuando surge de la prueba que eran amigos antes de ingresar en la cárcel de distrito y durante su reclusión en ella, racionalmente establece que el acusado

al tiempo del encuentro tenía conocimiento de las convicciones del interfecto por delitos de sangre. Siendo ello así, la evidencia del récord penal de la víctima ofrecida por el acusado para probar que al enfrentarse con el interfecto en el momento del encuentro el acusado tenía motivo para creer que se hallaba ante un enemigo peligroso, era admisible.

Toda vez que en el presente caso se hallaba en controversia cuál de los dos inició el combate, también esa prueba de convicciones era admisible para ese fin.

Siendo admisible la evidencia de las convicciones de la víctima bajo una y otra teoría, al denegar la corte la admisión en evidencia del récord penal del interfecto incurrió en error perjudicial a los derechos sustanciales del acusado, y por consiguiente *procede revocar la sentencia y devolver el caso a la corte inferior para la celebración de un nuevo juicio.*