EL PUEBLO DE PUERTO RICO, apelado, *v.* MODESTO MARTÍNEZ
SOLÍS, acusado y apelante.

*Número:* CR-87-80 *Resuelto:* 27 de febrero de 1991

*Miguel A. Valcourt Reinhardt*, abogado del apelante; *Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General, y Rose Mary Corchado Lorent, Procuradora General Auxiliar*, abogados de El Pueblo.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

El acusado apelante Modesto Martínez fue sentenciado a diez (10) años de prisión por el delito de homicidio, a cumplirse bajo el beneficio de sentencia suspendida.

No conforme, apeló alegando la comisión de cuatro (4) errores. La controversia principal, sin embargo, se reduce a determinar si un acusado que alega legítima defensa puede, al amparo de la Regla 20(A)(3) de Evidencia, 32 L.P.R.A. Ap. IV, traer ante la consideración del juzgador prueba del carácter de la víctima mediante actos específicos.

## Hechos

El Ministerio Fiscal presentó como testigos de cargo a Blanca Iris Ruiz, esposa consensual del occiso; a Jorge Pinto López, Carmen Leticia Rivera y Martín de Jesús, parte del grupo que acompañó a la víctima y a Blanca Iris el día de los hechos; al Sr. Rubén Cruz Nieves, padre del occiso; a Ángel Marcano, el policía que investigó la querella y se personó al lugar de los hechos poco después que ocurrieron, y a la Dra. Yocasta Brugal, patóloga forense que hizo la autopsia.

La defensa, por su parte, presentó como testigos a Carmen Lydia Meléndez, esposa consensual del acusado; a José A. Gómez Meléndez, Carlos Alberto Torres y Carlos Medina, tres (3) testigos de reputación, y al propio acusado apelante, Modesto Martínez Solís.

De acuerdo con el testimonio de Blanca Iris Ruiz, el 18 de mayo de 1986, con motivo de una actividad denominada como "Olimpiadas de Pueblo", la víctima, el Sr. Carlos Miguel Cruz, y ella habían pautado para esa tarde varios "viajes" de pasajeros.

La víctima Cruz se dedicaba a la transportación de niños escolares, mientras que su compañera se desempeñaba como acarreadora pública.

Por razón de unas fuertes lluvias la actividad se canceló. Entonces Cruz y Blanca Iris fueron a la oficina del Sr. Juan A. Delgado, también conocido como Luis Gelán, donde se reunieron con Jorge Pinto López, Carmen Lazú Nieves, Carmen Leticia Rivera Aponte, el propio Juan A. Delgado (Luis Gelán) y Martín de Jesús Montes, y acordaron trasladarse a un lugar donde pudieran jugar billar. Con ese propósito fueron a un negocio llamado La Roca, donde además se expendía licor. En este lugar el grupo ingirió tres (3) rondas de bebidas alcohólicas. Luego de permanecer un tiempo en el establecimiento, se trasladaron a La Loma del Viento en el sector Camino Nuevo de Yabucoa, propiedad del acusado apelante.

Al llegar al lugar, el grupo se dispersó dentro del negocio. En ese momento allí sólo se encontraba una pareja con niños. Al poco rato estos abandonaron el establecimiento.

Algunos de los integrantes del grupo se pusieron a conversar o a escuchar música, mientras que la víctima, Cruz, junto a Blanca Iris, se acomodó alrededor de la barra y ordenó dos (2) tragos y dos (2) cervezas. Un poco más tarde solicitó a la esposa consensual del apelante, Sra. Carmen Lydia Meléndez, quien estaba atendiendo la barra, algo de comer. Carmen Lydia respondió que lo que él quería comer tardaba de 15 a 20 minutos. Entonces, Blanca Iris le dijo a Cruz que no ordenara porque se iban a retirar del lugar. Acto seguido, éste pidió la cuenta de lo consumido y entregó a Carmen Lydia un billete para cobrar. Al recibir el cambio, comenzó a contar el dinero una y otra vez. Carmen Lydia, al percatarse de la situación se le acercó, preguntó qué sucedía y procedió a quitarle el dinero de las manos. Expresó que ella no era ladrona y lo contó nuevamente. Blanca Iris intervino en medio de este incidente diciéndole que el dinero era de su marido y él podía contarlo cuantas veces quisiera. Se produjo un intercambio de palabras insultantes entre ambas, acompañado de un aparente intento de agresión física de parte de una hacia la otra. Esto

provocó que Blanca Iris se cayera de la silla alta en que se encontraba. Blanca Iris intentó agredir a Carmen Lydia, pero luego desistió. De otra parte, Carmen Lydia, con el propósito de repeler el posible ataque de Blanca Iris, alcanzó una botella de licor.

Cuando se estaba suscitando este altercado, entró al lugar el acusado apelante. Al ver a su esposa alterada y llorando pidió a una empleada que la llevara a la cocina. Luego, entró al interior de la barra, tomó algo de debajo del mostrador y se lo puso en el bolsillo. El acusado apelante y la víctima discutieron mientras los acompañantes de Cruz trataban de convencerlo para que abandonara el lugar. Para tratar de hacer que Cruz abandonara el lugar, Blanca Iris lo sujetó por la cintura, mientras Jorge Pinto y Carmen Leticia lo sostenían por los brazos. Cruz, sin embargo, se sujetó de la barra de tal forma que produjo que la pieza se despegara por el área del centro donde estaba ensamblada. En el forcejeo, cayeron al piso un letrero que se hallaba a uno de los costados de la barra y varias botellas de licor que se encontraban en su interior.[1]

De acuerdo con los testigos de cargo, en el momento que se disponían a salir con Cruz, éste le dijo al acusado: "Sabes que me voy, pero no porque tengo miedo . . . ." E.N.P., pág. 8. Entonces el acusado lo miró seriamente y, unos segundos más tarde, sonó el primer disparo, hubo una pausa y luego se oyeron dos (2) disparos corridos. De acuerdo con el testimonio de Blanca Iris, en ese momento Cruz se encontraba a una distancia de cuatro (4) a cinco (5) pies de la barra. Los restantes testigos de cargo, que acompañaban al occiso el día de los hechos, declararon sustancialmente lo mismo que Blanca Iris.

El Ministerio Público no presentó información con respecto a la condición toxicológica del finado, ya que Cruz murió varios días después de los hechos.

---

[1] A pesar de esto, Blanca Iris declaró que su esposo no estaba embravecido ni exaltado de ánimo, y que no hubo necesidad de calmarlo para tratar de llevárselo. Negó además que Cruz se subiera en la barra. Con respecto a las fotos que le mostró el fiscal, la testigo señaló el lugar donde la barra estaba despegada y lo que parecían ser partículas de vidrio encima de la misma. Agregó que éstas podían ser cáscaras de maní.

Por su parte, el acusado declaró que al llegar a su estableci-
miento Cruz "estaba tratando de treparse por encima de la barra
y en actitud de lanzarse hacia el interior de ésta, encontrándose ya
con una de sus rodillas sobre el tope de la barra y estaba la otra
pierna en movimiento para brincar por encima de la superficie de
la barra". (2) Expresó que él le pidió que se tranquilizara y se
fuera a su casa, que tal vez en otro momento podrían hablar.
Entonces, con el propósito de impedir que Cruz lograra acceso al
revólver que había en uno de los anaqueles de la barra, el acusado
apelante tomó el mismo. Al subirse a la barra, la víctima la había
separado por los esquineros y parte de la mercancía que se
encontraba en su interior había caído al piso. (3) Siguió relatando
que finalmente Cruz optó por bajarse de la barra, lo que aprove-
charon sus acompañantes para sujetarle los brazos y la cintura e
intentar sacarlo del lugar. Éste se resistió a abandonar el lugar y
se mantuvo asido a la barra sin permitir que lo despegaran.
Señaló, además, que Cruz le escupió la cara y dijo: "Gero, tú sabes
qui[é]n es mi papá, y un día de éstos vas a saber quién soy yo"
(E.N.P., pág. 64); y agregó, "[u]no de los dos tenemos que morir"
(íd.). Acto seguido, Cruz se sacudió violentamente de los que lo
sujetaban y volvió a aferrarse de la barra. Luego de esto, se
agachó y levantó el ruedo del pantalón para sacar un revólver que
llevaba en el tobillo enfundado en una vaqueta. Al observar este
movimiento fue que el acusado hizo el primer disparo que alcanzó
a Cruz en el rostro. Agregó que entonces Cruz se abalanzó hacia
él hasta llegar a pegarse nuevamente de la barra. Luego continuó
agachándose detrás de la barra, al mismo tiempo que sacaba el
brazo por encima de la superficie de ésta con intenciones de
arrebatarle el arma. Bajo estas circunstancias, tras unos breves
segundos, se vio obligado a hacer dos (2) disparos consecutivos
más. (4)

---

(2) E.N.P., pág. 63.
(3) De una de las fotografías sometidas como *exhibit* (I H de ambas partes) se
aprecian varias botellas de licor y otros objetos tirados en el piso dentro del área interior
de la barra.
(4) E.N.P., págs. 63 a 65.

En cuanto al arma que la víctima portaba el día de los hechos, fuera del testimonio del acusado no se presentó otra evidencia directa sobre ese particular. Blanca Iris, por su parte, negó que su marido en ocasión alguna hubiera cargado en su persona un arma de fuego. Los demás testigos de cargo también negaron la versión del acusado. Cabe señalar que el policía que investigó los hechos no vio a la víctima antes de que la trasladaran al hospital. El traslado del herido hacia el hospital lo hicieron las personas que lo acompañaron al establecimiento La Roca y luego al lugar de los hechos.

El testimonio del acusado, en lo que se refiere al incidente de los disparos contra el occiso Cruz, no pudo ser corroborado totalmente por su esposa, ya que ésta, en ese momento, se encontraba en el área de la cocina.

Por su parte, la testigo de cargo, Dra. Yocasta Brugal, declaró en cuanto a las heridas de la víctima Cruz lo que a continuación transcribimos:

. . . Encontró un orificio de entrada localizado en el ángulo medular izquierdo a 67 pulgadas del talón y a dos y media pulgada [sic] de la línea media. Que la misma es de forma redonda, bordes invertidos y está rodeada por un anillo de abrasión.

En cuanto al trayecto de [sic] proyectil con respecto a dicho orificio de entrada, dice la testigo, que su examen reveló que el proyectil llevaba una dirección de arriba hacia abajo, de izquierda a derecha, y de delante a atrás; siguiendo esta dirección se hace evidente que el proyectil después de perforar la piel, los tejidos celulares subcutáneos y los músculos de la región, fracturó la cuarta y quinta vértebra cervical a cuyo nivel produjo laceración del cordón espinal. El proyectil fue recuperado del cadáver. Dicho proyectil aparece clasificado en el Protocolo de Autopsia con la letra A.

En su testimonio, la patóloga forense describe otro orificio de entrada localizado en el lado izquierdo del cuello en su tercio superior a 63-1/2 pulgada [sic] del talón. El mismo es de forma redondeada, bordes invertidos y está rodeado por un anillo de abrasión. El trayecto de este proyectil demostraba un carácter hemorrágico que va de arriba hacia abajo, de izquierda a derecha; en la línea media del cuello no se observa hemorragia, y no se pudo recuperar proyectil alguno. Esta herida está clasificada bajo la letra B en el Protocolo de Autopsia.

Finalmente la testigo describe un tercer orificio de entrada localizado en el hombro izquierdo en su aspecto anterior a 61 pulgadas del talón. El orificio es de forma redondeada, bordes invertidos y está rodeado por un anillo de abrasión. Examinado el trayecto, el testigo lo describe de izquierda a derecha. El proyectil produce orificio de salida y dos y media pulgada [sic] después de su entrada. El orificio se clasifica con la letra C en el Protocolo de Autopsia.

Explicó que todas las heridas de bala tenían anillo de abrasión, *eran heridas de disparo de distancia a más de dos pies hasta el infinito.* Que al occiso se le había practicado una traqueotomía mientras estuvo en el hospital, ya que era reciente. *Declaró que en cuanto a la primera herida de bala a 67 pulgadas del piso en el ángulo medular izquierdo, que la trayectoria era de izquierda a derecha de arriba hacia abajo, fracturó la cuarta y quinta vértebra cervical produciendo laceración del cordón espinal. Declaró que esa laceración del cordón espinal produce falta de movimiento en las extremidades, es decir, parálisis sobre todo en el brazo y pierna izquierda en forma inmediata.* Declaró que el ángulo de la bala de arriba hacia abajo puede deberse a que el área del cuello es una de gran movilidad. Que se marcó el proyectil ocupado y se presentaron fotografías del occiso que reflejaban las heridas que describió. (Énfasis suplido.)(5)

A preguntas de la defensa, la testigo manifestó que por las áreas impactadas por proyectiles en el cuerpo del occiso concluyó que necesariamente éste tenía que estar en un plano más bajo del nivel en que se encontraba el revólver que se utilizó para hacer los disparos.

La doctora explicó que si tanto el occiso como el acusado hubiesen estado parados sobre el mismo plano, o sea, en el piso del negocio, si se toma en consideración (1) la estatura del acusado, (2) que éste disparó su revólver desde una altura que equivalía a la que tenía el acusado a nivel del tórax y (3) que el occiso Cruz era de una estatura mayor a la del acusado, para que los proyectiles hubiesen recorrido la trayectoria que se encontró en el cadáver, necesariamente los tres (3) puntos de impacto tenían que estar a

(5) E.N.P., págs. 35 a 36.

un nivel inferior al que se encontraba el revólver de donde provinieron los disparos.

En el redirecto del Ministerio Público la doctora Brugal declaró que el área del rostro o cara es un área de gran movilidad, por lo que no puede realmente concluir en qué posición se encontraba el occiso con relación al arma de fuego. Al apelante lo acusaron de asesinato en primer grado por la muerte de Carlos Miguel Cruz y tentativa de asesinato en la persona de Blanca Iris Ruiz.[6]

■ Como podrá observarse, mientras la prueba de cargo estuvo dirigida a demostrar el asesinato en primer grado y la tentativa de asesinato, la representación legal del acusado apelante trató de probar que éste obró en legítima defensa.[7]

Es precisamente a la luz de la teoría de legítima defensa y la negativa por parte del tribunal a admitir ciertos testimonios encaminados a demostrarla, que surgen los principales planteamientos de error del acusado apelante. El tribunal excluyó prueba del carácter de la víctima cuyo propósito era demostrar que éste, en ocasiones anteriores y bajo los efectos del alcohol, había

---

[6] Blanca Iris sufrió una herida de bala en la parte inferior de la rodilla derecha. El proyectil hizo su entrada por el lado posterior de la rodilla y quedó alojada en los tejidos hasta que fue removida días más tarde. Blanca Iris no sabe precisar en qué momento en particular quedó herida, luego del primer disparo. Solamente recuerda que el occiso cayó encima de su pierna, ya que según su testimonio ella se mantenía sujetándolo por la cintura.

El Jurado declaró al acusado inocente del cargo de tentativa de asesinato con relación a la herida recibida por Blanca Iris Ruiz.

[7] De acuerdo con el Art. 22 del Código Penal:

"No incurre en responsabilidad el que defiende su persona, sus bienes o derechos, o su morada, o la persona, bienes o derechos, o morada de otros en circunstancias que hicieren creer razonablemente que se ha de sufrir un daño inminente, siempre que hubiere necesidad racional del medio empleado para impedir o repeler el daño, falta de provocación suficiente del que ejerce la defensa, y no se inflija más daño que el necesario al objeto.

"Para justificar el dar muerte a un ser humano, cuando se alegue legítima defensa, es necesario tener motivos fundados para creer que al dar muerte al agresor se hallaba el agredido o la persona defendida en inminente o inmediato peligro de muerte o de grave daño corporal.

"Para justificar la defensa de bienes o derechos las circunstancias indicarán un ataque a los mismos que constituya delito o los ponga en grave peligro de deterioro o pérdida inminente.

"Para justificar la defensa de morada las circunstancias indicarán una penetración ilegal o con el fin de cometer algún delito." 33 L.P.R.A. sec. 3095.

desplegado conducta similar a la del día de los hechos; prueba de que antes de llegar al establecimiento La Loma del Viento, el occiso, además de haber ingerido alcohol, había hecho uso de marihuana, y prueba de que la víctima comúnmente llevaba un arma de fuego en una vaqueta al tobillo.

Aclarados los hechos, pasemos a considerar las normas de derecho aplicables.

*Normas generales sobre la admisión o exclusión de prueba de carácter en un proceso penal*

 Comenzaremos por examinar las normas que gobiernan la admisión o exclusión de prueba de carácter. La norma general, conforme a la Regla 20(A) de Evidencia, 32 L.P.R.A. Ap. IV, es que "[e]videncia del carácter de una persona o de un rasgo de su carácter no es admisible cuando se ofrece para probar que en una ocasión específica la persona actuó de conformidad con tal carácter . . .". No obstante esta prohibición, bajo ciertas circunstancias y a manera de excepción, se permite prueba de carácter. Por ejemplo, se permite cuando el mismo acusado abre la puerta de su carácter, *Pueblo v. Fradera Olmo*, 122 D.P.R. 67 (1988); "[e]n una acción penal, sujeto a lo dispuesto en el inciso (E) de [la Regla 20 de Evidencia], si la evidencia es sobre el carácter de la víctima o rasgo de éste y es ofrecida por el acusado para probar la conducta de la víctima de conformidad con dicho carácter o rasgo de éste", Regla 20(A)(3) de Evidencia, 32 L.P.R.A. Ap. IV; "[s]i la evidencia es ofrecida por el ministerio fiscal para refutar evidencia aducida por el acusado bajo el inciso (3) [de la Regla 20(A)]", Regla 20(A)(4) de Evidencia, 32 L.P.R.A. Ap. IV, y "[s]i la evidencia es ofrecida por el ministerio fiscal en relación al carácter tranquilo o pacífico de la víctima en un caso de asesinato u homicidio, para rebatir evidencia de que la víctima fue el primer agresor", Regla 20(A)(5) de Evidencia, 32 L.P.R.A. Ap. IV.

Como puede apreciarse de las excepciones señaladas, éstas primordialmente se encaminan a brindar una mayor y mejor oportunidad al acusado para probar su inocencia. Estas excepcio-

nes tienen su razón de ser en lo sensitivo de los derechos fundamentales que están en juego.

A esos efectos, E.L. Chiesa, *Evidencia de carácter y de conducta específica bajo las Reglas de Evidencia de 1979*, XV Rev. Jur. U.I.A. 45, 50–51 (1980), señala:

> . . . En una causa criminal la puerta está sólo relativamente cerrada. El acusado —la defensa, para decirlo con mayor rigor— puede abrir esa puerta de cualesquiera de estas formas:
> 1) presentando evidencia del buen carácter del acusado —evidencia circunstancial de inocencia.
> 2) presentando evidencia de cierto carácter de la víctima, para probar que en el momento en cuestión actuó de conformidad con ese carácter.
> 3) presentando evidencia —en casos de asesinato u homicidio— de que la víctima fue el primer agresor.

■ Las excepciones a la norma general de exclusión de prueba de carácter deben cumplir con lo dispuesto en el inciso (C) de la Regla 20 de Evidencia, 32 L.P.R.A. Ap. IV:

> Cuando evidencia de carácter o de rasgo de carácter sea admisible, dicha evidencia puede presentarse mediante testimonio de reputación o en la forma de opinión. En el contra-interrogatorio se permitirá inquirir sobre conducta específica pertinente. En casos en que el carácter de una persona, o rasgo de éste, sea un elemento esencial de una acusación, reclamación o defensa, puede permitirse prueba de conducta específica.

En la situación de autos, a pesar de que la llamada "prueba de carácter" consistía fundamentalmente en prueba sobre actos específicos, tanto el apelante como el tribunal recurrido apoyaron sus respectivas posiciones en la doctrina de *Pueblo v. Cruz*, 65 D.P.R. 172 (1945). No la discutieron a la luz del citado inciso (C) de la Regla 20 de Evidencia.

■ En *Pueblo v. Cruz*, supra, nos enfrentamos a una controversia similar. En esa ocasión y bajo las reglas de evidencia anteriores, resolvimos que la prueba de actos específicos de la víctima ofrecida por el acusado para probar legítima defensa era admisible en dos (2) situaciones:

. . . (1) cuando está en controversia la cuestión de si la agresión partió del acusado o de la víctima; y (2) cuando el acusado trata de probar que al dar muerte a la víctima tenía motivo real o aparente para creer —considerando el carácter peligroso de la víctima— que al ser atacado por ésta se hallaba en inminente peligro de perder su vida o recibir grave daño corporal. En cuanto al primer caso, parece claro que si la víctima ha demostrado en ocasiones anteriores que era propensa a realizar tales actos de violencia, esa propensión constituiría una circunstancia a ser considerada por el jurado con el resto de la prueba, a los efectos de determinar cuál de los dos, la víctima o el acusado, había iniciado el combate. Bajo este primer caso, no es necesario que el acusado pruebe que tenía conocimiento de esos actos de violencia con anterioridad al encuentro. *Pueblo v. Cruz*, supra, pág. 178.

En esa ocasión, limitamos la prueba sobre actos específicos a casos de delitos de sangre. Véanse: *Pueblo v. Reyes Lara*, 100 D.P.R. 676 (1972); *Pueblo v. García García*, 98 D.P.R. 827 (1970); *Pueblo v. Rivera*, 67 D.P.R. 280 (1947).

Todos los casos en que hemos seguido esta norma son anteriores a la aprobación de las Reglas de Evidencia de 1979 y, por consiguiente, al inciso (C) de la Regla 20 de Evidencia, *supra*. Esto plantea la interrogante de si luego de las nuevas reglas debe o no de prevalecer la doctrina del caso de *Pueblo v. Cruz*, supra. Cabe señalar, además, que esta doctrina no ha sido modificada, revocada o ampliada desde que se enunció en 1945. Véase *Pueblo v. Velázquez Caraballo*, 110 D.P.R. 369 (1980).

■ Nuestra Regla 20 de Evidencia, *supra*, aunque no es una traducción literal de las reglas federales correspondientes, no cabe duda que en su enfoque teórico no es otra cosa que una combinación de las Reglas 404, 405 y 406 de Evidencia federal.[8] Específicamente, la Regla 404(a)(2) de Evidencia federal, 28

---

[8] Las citadas Reglas de Evidencia federales, 28 U.S.C., disponen como sigue:
Regla 404:
"(a) *Character evidence generally*. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
"(1) *Character of accused*. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

U.S.C., permite a un acusado presentar prueba del carácter de la víctima, y la 405(a) pauta la forma en que ésta debe presentarse. En esencia, ambas normas son equivalentes a nuestra Regla 20(A)(3) y (C) de Evidencia, *supra.*

■ La directriz general contenida en la Regla 404(a) de Evidencia federal, *supra*, es que, excepto bajo ciertas excepciones importantes, evidencia de carácter de una persona o de un rasgo de ésta no debe ser aceptada si su pertinencia es sólo para probar que una persona actuó en algún momento conforme a tal carácter. En otras palabras, la norma general es que evidencia de carácter no puede presentarse para probar conducta de forma circunstancial. 2 *Louisell and Muller, Federal Evidence* Sec. 136, pág. 124 (1985).

■ Por el contrario, esta prohibición no es aplicable si esa misma evidencia se ofrece con un propósito distinto, como sería probar intención, motivo, oportunidad, plan, conocimiento, etc., o si queda enmarcada bajo alguna de las excepciones que la misma Regla 404(b) de Evidencia federal, 28 U.S.C., provee. En tal caso

"(2) *Character of victim.* Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

"(3) *Character of witness.* Evidence of the character of a witness, as provided in Rules 607, 608, and 609.

"(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Regla 405:

"(a) *Reputation or opinion.* In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

"(b) *Specific instances of conduct.* In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct."

Regla 406:

"Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

sería admisible prueba del carácter de la víctima, prueba del carácter del acusado bajo ciertas circunstancias o prueba de carácter con el propósito de impugnar un testigo. Véase Regla 404 de Evidencia federal, *supra*; 2 *Weinstein's Evidence* Commentary 404(01), pág. 404-12 *et seq.* (1980).

■ La norma general de exclusión de nuestra Regla 20 de Evidencia, *supra*, encuentra apoyo en el consenso generalizado de que este tipo de prueba engendra los peligros siguientes: que el Jurado le adscriba un peso mayor del que realmente merece; que le desvíe su atención de los elementos centrales del caso, o que alargue innecesariamente un proceso. Véanse los comentarios sobre el *Proyecto de las Reglas de Evidencia para el Tribunal General de Justicia del Estado Libre Asociado*, 73 Rev. Der. Pur. 64 (1979). En vista de ello, la admisión de prueba de carácter se hace depender de tres (3) criterios, a saber: el propósito para el cual se presenta; la modalidad bajo la cual se ofrece, y el tipo de procedimiento que sea (civil o criminal). G.C. Lilly, *An Introduction to the Law of Evidence*, Minnesota, West Publishing Co., 1978, pág. 102.

■ Cuando bajo alguna de las excepciones se permite prueba de carácter, primero hay que determinar si se está ofreciendo como prueba directa o circunstancial.

■ El uso del carácter como prueba directa procede únicamente cuando el carácter o un rasgo de éste es un elemento esencial de una acusación, reclamación o defensa.[9] Regla 20(C) de Evidencia, *supra*.

---

[9] Para expresar que el carácter es un elemento esencial de una acusación, reclamación o defensa a veces se utiliza el término de que el carácter está en "controversia". Esta expresión causa confusión, pues se tiende a pensar que por el hecho de haberse ofrecido prueba de carácter como prueba circunstancial, esto automáticamente convierte el carácter en un elemento esencial. Para que se considere que el carácter está en controversia o es un elemento esencial, éste debe ser parte de un hecho operativo mediante el cual se determina el derecho de las partes bajo la ley sustantiva. Ejemplos serían casos tales como seducción, difamación, etc. Wright and Graham, *Federal Practice and Procedure: Evidence* Sec. 5267.

■ Las circunstancias bajo las cuales se permite como prueba directa son escasas. Véase *Louisell and Muller*, supra, Sec. 148, pág. 314, y Sec. 150, pág. 134. Por tal razón, el uso de prueba de carácter es mayormente de naturaleza circunstancial. Esto es, de la evidencia ofrecida el juzgador deberá primero inferir la existencia de los aspectos relevantes del carácter, y de esto entonces podrá inferir que la persona actuó de forma compatible con ese carácter. Lilly, *op. cit.*; E.W. Cleary, *McCormick on Evidence*, 3ra ed., Minnesota, Ed. West Publishing Co., 1984, Sec. 186. Este tipo de inferencia, sin embargo, no se permite indiscriminadamente. De acuerdo con el texto expreso de las reglas, su uso está permitido solamente en casos criminales. Esto resulta totalmente explicable ya que, en ausencia de prueba directa, el uso de prueba sobre el carácter de una persona, como prueba circunstancial, puede ser la única forma en que el acusado pueda probar su teoría de defensa. Lilly, *op. cit.*, Sec. 38, pág. 109.

■ Específicamente, bajo la Regla 20(A)(3) de Evidencia, *supra*, se permite prueba del carácter de la víctima por la trascendencia que ésta pueda tener para la defensa de un acusado. "Por eso, en causa de delitos tales como asesinato, homicidio, mutilación —o cualquier delito de agresión— la defensa puede presentar evidencia del carácter agresivo o violento de la víctima —para establecer, por ejemplo, una legítima defensa— aunque el ministerio público no haya presentado prueba de que el acusado fue el primer agresor o quien empezó la riña." Chiesa, *supra*, pág. 52. No obstante, debe tenerse presente que esta prueba de carácter se considera potencialmente peligrosa. A pesar de ello, el comentarista McCormick se inclina a favor de permitir que el acusado pueda presentarla en casos de asesinato y agresión:

> The fact that the character of the *victim* is being proved renders inapposite the usual concern over the untoward impact of evidence

---

De otra parte, en los casos de legítima defensa no se considera que el carácter está en controversia por el hecho de que se ofrezca como prueba circunstancial de que la víctima haya podido ser el primer agresor. 1A *Wigmore on Evidence* Sec. 63.1.

of the defendant's poor character on the jury's assessment of the case against him. There is, however, a risk of a different form of prejudice. Learning of the victim's bad character could lead the jury to think that the victim merely "got what he deserved" and to acquit for that reason. *Nevertheless, at least in murder and perhaps in battery cases as well, when the identity of the first aggressor is really in doubt, the probative value of the evidence ordinarily justifies taking this risk.* (Énfasis suplido.) Cleary, *op. cit.*, Sec. 193, pág. 572.

En resumen, cuando se ofrece prueba de carácter, ésta será evaluada y considerada como prueba directa o circunstancial, según sea el propósito con que se ofrezca. Cuando lo que se busca es que el juzgador infiera que el día de los hechos el acusado o la víctima actuó conforme a su carácter, dicha prueba es de naturaleza circunstancial y como tal se debe tratar. Regla 20(A)(3) de Evidencia, *supra*.

*Forma de presentar prueba de carácter*

Pasemos ahora a considerar la forma en que debe ofrecerse la prueba de carácter.

Bajo la Regla 20(C) de Evidencia, *supra*, la prueba de carácter se circunscribe a testimonios de opinión, de reputación y actos específicos. De los tres (3) medios de prueba, se dice que el uso de actos específicos es el que potencialmente engendra mayores peligros en cuanto a prejuicios y confusión se refiere. *United States v. Davis*, 546 F.2d 583 (5to Cir. 1977). Por esa razón, las propias reglas limitan el uso de actos específicos a aquellos casos en que el carácter está en controversia, es un elemento esencial o se trae mediante el contrainterrogatorio de un testigo que declaró sobre la reputación u opinión del carácter del acusado o de la víctima. Esta norma persigue disminuir los riesgos de que el juzgador llegue a una conclusión impresionado por la conducta pasada del acusado o de la víctima, en vez de por lo sucedido el día de los hechos.

Sobre los medios de prueba disponible, McCormick comenta:

> . . . Character is susceptible of proof by evidence of conduct that reflects some character trait, by a witness's testimony as to his own opinion based on personal observations, or by testimony as to reputation generally. As one moves from the specific to the general in this fashion, the pungency and persuasiveness of the evidence declines, but so does its tendency to arouse undue prejudice, to confuse and distract, and to raise time-consuming side issues. Traditionally, where character evidence could come in at all, the relatively neutral and unexciting reputation evidence was the preferred type. (Escolios omitidos.) Cleary, *op. cit.*, Sec. 186, pág. 550.

En vista de la norma general, pasemos ahora a analizar si cuando el acusado decide hacer uso de la Regla 20(A)(3) de Evidencia, *supra*, y traer, por lo tanto, prueba del carácter de la víctima, está limitado a testimonios de opinión o reputación solamente. Resulta importante tener presente que la excepción en cuestión tiene, en gran medida, el propósito de proveerle a un acusado los medios para que pueda demostrar que aunque cometió los hechos lo hizo en legítima defensa.[10] Los comentaristas Louisell y Wigmore entienden que de la Regla 405 de Evidencia federal, equivalente a la Regla 20(C) de Evidencia nuestra, *supra*, no se desprende excepción especial alguna a la prohibición del uso de actos específicos para probar carácter de forma circunstancial. Véanse, además: Lilly, *op. cit.*, Sec. 40, pág. 117; Wright and Graham, *Federal Practice and Procédure: Evidence* Sec. 5237; *Weinstein*, supra, Secs. 404(06), 405(01) y 405(04); P.L. Rothstein, *Evidence in a Nutshell: State and Federal Rules*, 2da ed., Minnesota, Ed. West Publishing Co., 1981, Cap. 8, pág. 365; Cleary, *op. cit.*, Sec. 186, pág. 550. Del texto expreso de la Regla 20(C) de Evidencia, *supra*, tampoco se desprende

---

[10] Cuando se hace una alegación de legítima defensa, su efecto inmediato es colocar ante la consideración del juzgador si, a la luz de las circunstancias en que se desenvuelven los hechos, el acusado actuó de forma razonable al defenderse de la víctima. Esta determinación requiere, por demás, que se evalúe su proceder tanto a la luz de la conducta de la víctima como del temor real que pudo tener el acusado en cuanto a si se encontraba en una situación de peligro. G.C. Lilly, *An Introduction to the Law of Evidence*, Minnesota, Ed. West Publishing Co., 1978, pág. 20.

excepción alguna. Su lenguaje es claro y categórico. Cuando se alega legítima defensa y se ofrece prueba del carácter de la víctima, los medios disponibles se reducen a testimonios de reputación u opinión. Para justificar la razonabilidad de la defensa, el acusado, a tenor con lo provisto en la Regla 20(C) de Evidencia, *supra*, lo hará mediante testimonios de opinión o reputación relativos a aquellos elementos de la personalidad de la víctima que denoten carácter violento o pendenciero. La norma general persiste independientemente de que la prueba de carácter sea con relación a la víctima y no al acusado.(11)

Luego de la anterior conclusión, parecería lógico pensar que con ella se imprime carácter final a la controversia sobre el modo de ofrecer prueba del carácter de una víctima. Sin embargo, al examinar la jurisprudencia federal aplicable a casos análogos, encontramos que con frecuencia los tribunales se desvían de esta norma y permiten prueba de actos específicos como prueba del carácter de la víctima.

Los tribunales de gran parte de los estados que han adoptado reglas parecidas a las federales, al igual que los tribunales federales, con frecuencia y sin aparente justificación también se han apartado de la implantación estricta de la norma establecida en la Regla 405 de Evidencia federal, *supra*.(12)

---

(11) De modo ilustrativo, Louisell señala:

". . . [B]y virtue of Rules 404 and 405, it seems that proof of the victim's character or disposition must be cast in the form of opinion or reputation testimony. It is true that Rule 405(b) permits evidence of specific instances when character is an element of a charge, claim or defense, but this condition is not satisfied merely because the accused offers evidence of the victim's character to prove, for example, that he started the affray: *Here the accused does not state a defense by proving a character trait (such as that the victim was belligerent), but by proving that the victim started the fight, so it is Rule 405(a) —and not Rule 405(b)— which provides the applicable principle, and evidence of specific instances is inadmissible to prove the conduct of the victim at the time.*" (Énfasis suplido y escolios omitidos.) 2 *Louisell and Muller, Federal Evidence* Sec. 139, págs. 164–166 (1985).

(12) Véanse, a modo ilustrativo, algunos casos resueltos antes y después de la aprobación de las Reglas federales de 1 de junio de 1975 en muchos de los cuales se ha admitido prueba de actos específicos de la víctima: *Evans v. United States*, 277 F.2d 354 (1960); *United States v. Burks*, 470 F.2d 432 (1972); *United States v. Greschner*, 647 F.2d 740 (1981); *Government of Virgin Islands v. Carino*, 631 F.2d 226 (3er Cir. 1980); *Trujillo v. Sullivan*, 815 F.2d 597, 612 n. 8 (1987); *United States v. Fountain*, 642 F.2d 1083 (7mo Cir. 1981); *Perrin v. Anderson*, 784 F.2d 1040 (10mo Cir. 1986); *Government of Virgin Islands*

Sobre este particular, el comentarista Wigmore nos dice:

> When a character trait of the victim of a crime is relevant, . . . there is no substantial reason against evidencing, the character by particular instances of the victim's conduct. Such instances may be very significant; their number can be controlled by the trial court's discretion; and the prohibitory considerations applicable to an accused's character . . . have here little or no force. Thus, for example, when the turbulent character of the deceased is relevant in a criminal prosecution for homicide, particular instances of violent or quarrelsome conduct by the victim should be admissible. *As a general rule, however, the character of the victim may not be shown by particular instances of conduct unless those instances of conduct are independently admissible to show some matter apart from character as circumstantial evidence of the conduct of the victim on a particular occasion.* (Énfasis suplido.) 1A *Wigmore on Evidence* Sec. 63.1, pág. 1382 (1983).

Los tribunales han permitido prueba de carácter mediante el uso de actos específicos cuando el acusado ha alegado legítima defensa y demostrado que tenía conocimiento previo del carácter de la víctima. El acusado en estos casos trata de justificar la razonabilidad de su conducta, no frente al hecho objetivo de que la víctima había sido el primer agresor, sino en conformidad con el estado mental del acusado al momento de los hechos. Se pretende probar miedo o aprehensión ante la creencia real o aparente de que él u otra persona se hallaba en peligro de sufrir grave daño corporal.

La alegación de legítima defensa hay que evaluarla a la luz de dos (2) vertientes diferentes. En la primera se alega que la víctima fue el primer agresor y, en ausencia de medios directos con qué demostrarlo, se recurre al uso de prueba de carácter. Frente a dicha evidencia, el juzgador puede hacer la inferencia de que resulta más probable que, conforme al cáracter de la víctima, ésta haya sido el primer agresor. El conocimiento previo del

---

*v. Solis*, 475 F. Supp. 542 (1979); *State v. Dutremble*, 392 A.2d 42 (1978); *State v. Amos*, 347 N.W.2d 498 (1984); *People v. Jones*, 675 P.2d 9 (1984); *State v. Boykins*, 350 N.W.2d 710 (1984); *Rolle v. State*, 314 So. 2d 167 (1975).

acusado sobre el carácter violento de la víctima no es requisito. En la segunda, por el contrario, se busca justificar la conducta del acusado a la luz de su estado mental, independientemente de que la víctima en efecto haya sido el primer agresor. En esta situación, el conocimiento previo por parte del acusado del cáracter violento de la víctima resulta medular para poder justificar, bajo esta vertiente, la alegación de legítima defensa. En este caso, los tribunales permiten el uso de actos específicos. El propósito, sin embargo, no es probar el carácter de la víctima, sino el conocimiento previo que el acusado tenía de ésta y, por ende, la razonabilidad de su conducta conforme al temor que pudo sentir ante la confrontación con la víctima. Esto es un uso independiente y separado de la prueba de carácter, ante lo cual la Regla 20(A) y (C) de Evidencia, *supra*, no es aplicable.

Por otro lado, también es preciso aclarar que aunque un acusado alegue legítima defensa conforme a que la víctima fue el primer agresor, puede traer actos específicos de la víctima, cuando de igual manera su propósito no es probar carácter sino aportar prueba en apoyo de su versión de los hechos. *Cf. Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988).

En cuanto a este aspecto, *Wright and Graham, Federal Practice and Procedure: Evidence* Sec. 5237, pág. 398, nos apunta que:

> . . . Use of the character of the victim to prove his conduct must be distinguished from its use for other purposes. For example, the defendant may wish to prove the character of the victim in order to show his fear of the victim in order to convince the jury of the reasonableness of his self-defensive acts. Such use of the character of the victim limits the proof of character to those traits known to the defendant, a requirement not applicable when character is offered to prove the conduct of the victim under Rule 404(a)(2). As previously explained, *when the character of the victim is offered to prove some fact other than his own conduct, Rule 404(a) does not apply*. The admissibility of character evidence for these other purposes is governed by the general rules of relevance. (Énfasis suplido y escolios omitidos.)

Véanse, además: Commentario, *Evidence: Prosecution for Homicide or Assault: Self-Defense: Admissibility of Character and Threats of Victim*, 25 Cal. L. Rev. 459, 460 (1937); *Weinstein*, supra, Sec. 404(06), pág. 404-49.

En síntesis, cuando un acusado alega legítima defensa conforme a su estado mental ante el conocimiento del carácter agresivo de la víctima, o cuando haya hecho alegación de que la víctima fue el primer agresor, si trae prueba de actos específicos con un propósito ajeno a probar el carácter de ésta, no es de aplicación la Regla 20(A) y (C) de Evidencia, *supra*. La prueba entonces hay que evaluarla dentro del contexto de los principios generales de pertinencia. Reglas 18, 19 y 20(B) de Evidencia, 32 L.P.R.A. Ap. IV. Sobre el particular nos comenta el profesor Chiesa:

> Aunque evidencia de la comisión de otros delitos, daño civil u otros actos no es admisible para probar el carácter de una persona, con miras a demostrar que actuó de conformidad con tal carácter, *dicha evidencia es admisible si es pertinente para otros propósitos*, tales como prueba de motivo, oportunidad, intención, preparación, plan, conocimiento, identidad o ausencia de error o accidente. (Énfasis suplido.) Chiesa, *supra*, pág. 56 n. 28.

Establecido lo anterior, nos resta analizar los hechos a la luz de la discusión que antecede.

*Aplicación de las normas de derecho a los hechos*

En el caso de autos el apelante hizo una alegación de legítima defensa. Su contención principal fue que la víctima fue el primer agresor. De acuerdo con su versión de los hechos, se vio precisado a dispararle al occiso Cruz al percatarse de que éste intentaba hacer uso de un revólver que llevaba bajo el ruedo de su pantalón.

Con el propósito de probarle al Jurado que el occiso Cruz fue el primer agresor, el apelante ofreció varios testimonios entre los cuales constaban relatos de actos específicos de la víctima. Esta evidencia fue excluida. El tribunal excluyó los testimonios de José Gómez Meléndez, Carlos A. Torres González, Carlos Medina y William Ríos Malavé. Éstos declararon en ausencia del Jurado.

Tampoco permitió dos (2) declaraciones juradas, una de Alberto Sánchez Ortiz y otra de Enrique Santana.[13]

Examinemos el contenido de los testimonios excluidos.

En cuanto al testimonio de José Gómez Meléndez, éste fue a los efectos de que en la noche de los hechos él estaba trabajando en el negocio La Roca. Luego de haberle servido tres (3) rondas de bebidas alcohólicas al grupo en que se encontraba la víctima, ésta se le acercó y le dijo: "¿no hay ná para el casco?" (E.N.P., pág. 47), refiriéndose a marihuana. Él contestó en la negativa. La víctima, al oir la respuesta, sacó y prendió un cigarrillo de marihuana. Al ver esto, Gómez Meléndez le pidió a Cruz que saliera fuera del negocio a fumar. Entonces siguió sirviendo tragos, pero al notar que Cruz no estaba en el negocio ni en los alrededores, se dirigió al baño donde lo encontró fumando el cigarrillo de marihuana. Le llamó la atención vehementemente y Cruz salió a la parte de afuera del negocio. Allí se acercó a Luis Gelán para pasarle a éste el cigarrillo de marihuana.

Sobre el incidente entre el occiso y Gómez con relación al cigarrillo de marihuana, también fue excluido el testimonio de Carlos A. Torres González.

En el caso de autos los testimonios excluidos de Gómez Meléndez y Torres González tenían como finalidad demostrar la condición de la víctima al momento de ocurrir el incidente, ante la posible combinación del uso de alcohol y marihuana. Por lo tanto, dicha evidencia tenía un uso separado e independiente al de probar el carácter de la víctima. Frente a este ofrecimiento de prueba, el Estado señala en su alegato que se excluyó correctamente, puesto que el efecto hubiera sido causar perjuicio indebido en el Jurado bajo la teoría de que una persona que usa drogas no merece que se le trate como un ser humano y merece que se le prive de su vida sin mayores consecuencias. Además, señala que si el interés era demostrar que el alcohol y la marihuana produjeron

---

[13] En cuanto a las dos (2) declaraciones juradas, no surgen del expediente las razones por las que no se presentaron los declarantes. Sin embargo, de la Exposición Narrativa de la Prueba se sobreentiende que éstas aducían a actos específicos de conducta agresiva por parte del acusado en situaciones anteriores.

determinado estado de ánimo en la víctima, la forma correcta para hacerlo era mediante el uso de un perito.

Dado los hechos y circunstancias del caso de autos, el tribunal no abusó de su discreción al excluir el incidente sobre el uso de la marihuana unido al uso del alcohol, ya que el perjuicio que podía causar en el Jurado era mayor que su valor probatorio.[14]

■ El testimonio de Carlos Medina giró alrededor de un incidente ocurrido un (1) año y cuatro (4) meses antes. En esa ocasión él se encontraba en el área de un establecimiento donde también se hallaba la víctima y su compañera. En este lugar una persona de nombre Herminio Cruz saludó a Blanca Iris y le echó el brazo por la espalda. La víctima Cruz se molestó y por ello tuvieron una fuerte discusión. Cruz le manoteó en la cara al referido caballero. Resulta obvio que con prueba sobre este incidente aislado se intentó demostrar el carácter de la víctima. Esta evidencia no era admisible para otros propósitos. No tenía un uso separado e independiente. No erró el tribunal al excluirla.

Cabe señalar, sin embargo, que a este testigo se le permitió declarar con relación a que el día de los hechos había visto a la víctima y que éste se encontraba en estado de embriaguez. Agregó que durante una conversación entre ellos, él le advirtió que se cuidara, que no fuera a tener ningún problema. Cruz, a su

---

(14) Estudios hechos sobre el uso de la sustancia controlada conocida por "marihuana" (*cannabis sativa*) reflejan que su consumo, como norma general, *no causa* agresividad en sus usuarios. Del trabajo de estos tratadistas se desprende, sin embargo, que un uso excesivo de la misma *podría acentuar una conducta agresiva previa*, presente en el individuo antes del consumo de la marihuana. E. Goode (Compilador), *Marijuana*, Nueva York, Atherton Press, 1969, Cap. II, págs. 43–59; L. Grinspoon, *Marihuana Reconsidered*, 2da ed., Cambridge, Harvard U. Press, 1977, Cap. II, págs..291–322; *Pueblo v. Ortiz Pepín*, 105 D.P.R. 547, 574–575 (1977), voto concurrente del Juez Asociado Señor Negrón García.

En el caso de autos no se presentó prueba admisible sobre el carácter agresivo del occiso. Tampoco se presentó prueba referente a situaciones donde se hubiese hecho uso previo de esta sustancia. Bajo estas circunstancias, y tomando en consideración los estudios antes mencionados, la prueba presentada mediante el testimonio de José Gómez Meléndez y Carlos Torres González, relativa al uso de alcohol y marihuana por parte de la víctima el día en que ocurrieron los hechos, no era admisible.

Sobre el uso de drogas y alcohol en Puerto Rico, con relación a los delitos de asesinato y homicidio, véase *Víctimas de asesinatos-homicidios y su posible relación con el problema de las drogas, Año Fiscal 1989–1990 y Enero a Mayo de 1988 y 1990*, San Juan, Centro de Análisis Estadístico del Departamento de Justicia de Puerto Rico, 1990.

vez, le contestó que no se preocupara, que él estaba preparado. Acto seguido levantó el ruedo del pantalón y le mostró el arma que llevaba.

William Rivas Malavé, por su parte, declaró que conoció a Cruz por medio de un mecánico con el cual el testigo trabajó como ayudante. Cruz había ido a su casa porque le habían dicho que él tenía balas y Cruz quería comprarlas. Midió las balas en el revólver que tenía de calibre 38, de cañón corto, con cachas color caoba oscuro. Las balas no le sirvieron. Eran más largas que las que se usaban en esa clase de arma; no le cerraba la masa. Luego de eso, Cruz volvió en otra ocasión por su casa a ver si tenía más balas que le pudiese vender. Conocía al acusado desde hacía como ocho (8) años. A Cruz lo había visto una vez en el negocio del acusado. Se enteró de la muerte de Cruz en una conversación que sostuvo con Lydia en el negocio del acusado. Él comentó que milagrosamente el occiso no había sacado el revólver, que éste le había ido a comprar balas y que él había visto el arma que éste siempre portaba encima. Siempre que lo veía cuando iba a buscar la guagua notaba que tenía el arma en la pierna.

■ El testimonio excluido de Rivas Malavé tenía un uso independiente y separado al de probar el carácter de la víctima. El propósito de dicho testimonio era el de corroborar la versión del acusado de que la víctima intentó hacer uso de un arma de fuego que comúnmente llevaba consigo. Este testimonio, por varias razones, era un punto angular en la defensa del acusado. El acusado declaró que la víctima había sido el primer agresor. La defensa carecía de prueba directa para corroborar este hecho. Todos los testigos oculares eran parte del grupo que acompañaban a la víctima. Estos fueron los que trasladaron a la víctima al hospital. En fin, el acusado dependía del peso que mereciera su testimonio unido a toda aquella otra prueba circunstancial pertinente que pudiera convencer al Jurado de la probabilidad de que el incidente ocurrió según éste relató. No estamos frente a un caso donde la alegación es inverosímil, remota y carente de toda probabilidad. Del testimonio de la Dra. Yocasta Brugal se des-

prendía que el occiso era de mayor estatura que el acusado y que parados sobre un mismo plano, las balas en el cuerpo del occiso seguían un ángulo de arriba hacia abajo. Esto era compatible con lo expresado por el acusado.

■ Examinados todos los hechos a la luz de la normativa antes expuesta, concluimos que el foro de instancia erró al excluir el testimonio de William Rivas Malavé. El testimonio de éste no iba dirigido a demostrar el carácter de la víctima. El propósito era apoyar el testimonio del acusado sobre su versión de los hechos. Era evidencia pertinente que, unida a la prueba presentada por la defensa, al ser evaluada en su totalidad por el Jurado pudo haberlos motivado a concluir que el acusado efectivamente había actuado en defensa propia. Este testimonio no constituía prueba de carácter bajo la Regla 20(A)(3) de Evidencia, *supra*. Además, el testimonio de Rivas Meléndez era prueba de impugnación de lo declarado por la esposa consensual de la víctima, Carmen Iris.[15]

Pasemos ahora a examinar si la prueba erróneamente excluida fue un factor decisivo o sustancial de forma tal que amerite la revocación de la sentencia.

■ Reiteradamente hemos expresado que la exclusión o la admisión errónea de evidencia no conlleva revocación de una convicción cuando tal exclusión o admisión no es factor decisivo o sustancial en el veredicto. Reglas 4 y 5 de Evidencia, 32 L.P.R.A. Ap. IV; *Pueblo v. Fradera Olmo*, supra; *Pueblo v. Pellot Pérez*, 121 D.P.R. 791 (1988); *Pueblo v. Mattei Torres*, 121 D.P.R. 600 (1988); *Pueblo v. Lebrón González*, 113 D.P.R. 81 (1982); *Pueblo v. Franceschini Sáez*, 110 D.P.R. 794 (1981). Sin embargo, cuando la exclusión o admisión errónea es de tal envergadura que el tribunal considera que ésta fue factor decisivo o sustancial en la sentencia, procede la revocación y concesión del remedio solicitado.

■ En este caso la prueba excluida resultaba de suma importancia para la defensa del acusado. De haber creído el

---

[15] Ésta declaró que la víctima nunca portó un arma de fuego.

Jurado que la víctima fue el primer agresor y que portaba un arma que intentó usar contra el acusado, el veredicto pudo haber sido de "no culpable". Cabe señalar que el hecho de que se le haya encontrado culpable por un delito menor al imputado no priva al apelante de su derecho a presentar prueba que lo exonere totalmente.

En atención a todo lo anterior, *se dictará sentencia mediante la cual se revoque la apelada y se devuelva el caso para la celebración de un nuevo juicio.*(16)

El Juez Asociado Señor Hernández Denton emitió opinión concurrente y disidente. Los Jueces Asociados Señores Negrón García y Rebollo López concurren con el resultado sin opinión escrita.

—O—

Opinión concurrente y disidente emitida por el Juez Asociado Señor Hernández Denton.

Por entender que actuó correctamente el foro de instancia al excluir los testimonios sobre la conducta anterior de la víctima bajo los efectos del alcohol y de la marihuana, concurro con la opinión mayoritaria. Sin embargo, disiento de la conclusión de que procedía que se le permitiese al acusado traer prueba de que la víctima comúnmente portaba un arma de fuego y que la exclusión constituye un error perjudicial y sustancial que amerita la revocación de la sentencia apelada.

El apelante, Modesto Martínez Solís, fue acusado por los delitos de asesinato en primer grado y tentativa de asesinato. El Jurado lo encontró culpable del delito de homicidio y lo absolvió del delito de tentativa de asesinato. Inconforme, apela ante este Foro y señala, en síntesis, que erró el tribunal de instancia al excluir prueba de actos específicos de la víctima tendentes a

---

(16) Conforme al resultado a que hemos llegado, no es necesaria la discusión de los demás errores señalados.

demostrar que actuó en legítima defensa. La única controversia que debemos resolver es si esta prueba era admisible.

I

El 18 de mayo de 1986 Martínez Solís mató de tres (3) disparos a Carlos Miguel Cruz Delgado en el negocio "La Loma del Viento" localizado en el municipio de Yabucoa. El día del juicio su abogado trató de presentar prueba sobre actos específicos de la víctima para llevar al ánimo del Jurado que él fue el primer agresor y que Martínez Solís actuó en legítima defensa. Para determinar si erró o no el tribunal sentenciador es preciso examinar brevemente la prueba excluida.

El testigo de defensa José Antonio Gómez Meléndez declaró en ausencia del Jurado que el día de los hechos y horas antes de llegar a "La Loma del Viento" había visto a la víctima fumar un cigarrillo de marihuana en el negocio "La Roca" localizado también en el municipio de Yabucoa. El tribunal excluyó este testimonio. E.N.P., págs. 46–48.

Luego de este testimonio, declararon los testigos Carlos Alberto Torres (E.N.P., págs. 52–54); Carmen Lydia Meléndez, concubina del apelante (E.N.P., págs. 52–62), y el apelante Modesto Martínez Solís (E.N.P., págs. 63–70). De la Exposición Narrativa de la Prueba se desprende que no se excluyó ninguna parte del testimonio de estos testigos.

El próximo testigo de la defensa fue Carlos Medina. Éste declaró en ausencia del Jurado que en una ocasión, un (1) año y cuatro (4) meses antes de la fecha en que declaraba, había visto a la víctima tener una discusión con un hombre que le había echado el brazo por la espalda a su esposa. E.N.P., pág. 71. El tribunal de instancia excluyó esta parte del testimonio.

Por su parte, el testigo William Rivas Malavé declaró en ausencia del Jurado que conocía a la víctima hacía ocho (8) años. Rivas Malavé declaró que la víctima había ido a su casa en dos (2) ocasiones a comprar balas para su revólver calibre 38. De la Exposición Narrativa de la Prueba no surge en qué fecha fue que

la víctima visitó al testigo a efectuar esa transacción. El testigo también declaró que cuando se enteró de la muerte de la víctima en una conversación que sostuvo con la concubina de Martínez Solís le comentó que "milagrosamente el occiso no había sacado el revólver; que él le había ido a comprar balas; que él había visto el arma y que siempre la portaba encima porque él siempre que lo veía cuando iba a buscar la guagua, notaba que tenía el arma en una vaqueta en la pierna izquierda". E.N.P., pág. 74. El tribunal de instancia excluyó esta parte del testimonio. Tampoco se admitieron unas declaraciones juradas de los testigos Alberto Sánchez Ortiz y Enrique Santana ofrecidas por la defensa.

## II

Al evaluar la controversia de autos partimos de la premisa que la Regla 20(A) de Evidencia, 32 L.P.R.A. Ap. IV, es una regla de exclusión fundamentada en el poco valor probatorio que tiene una evidencia de carácter frente a la probabilidad de un efecto perjudicial indebido. Con excepción de las situaciones específicas dispuestas en la regla, se decidió excluir prueba circunstancial de carácter, cuando lo que se intenta es que el juzgador infiera de la misma cierta conducta que se pretende demostrar. E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1984, Vol. I, págs. 68–73.

A modo de excepción, la Regla 20(A)(3) de Evidencia, 32 L.P.R.A. Ap. IV, permite a la defensa presentar prueba del carácter de la víctima para demostrar que el día de los hechos éste actuó en conformidad con su carácter. En los casos en que, como en el de autos, se trata de probar que el acusado actuó en legítima defensa, se permite el uso de esta regla para demostrar que la víctima actuó en conformidad con su carácter violento o pendenciero y así inferir que el acusado actuó en su legítima defensa.

Pero "[u]na vez la defensa hace uso de la Regla 20(A)(3), el ministerio público, bajo la Regla 20(A)(4), puede presentar evidencia de carácter de la víctima que desmienta el alegado carácter presentado por la defensa. También puede, en el contrainterro-

gatorio pertinente, hacer referencia a actos específicos de la víctima que nieguen el alegado carácter. . . . La situación es, pues, análoga a la de las reglas 20(A)(1) y 20(A)(2)". E.L. Chiesa, *Evidencia de carácter y de conducta específica bajo las Reglas de Evidencia de 1979*, XV Rev. Jur. U.I.A. 45, 53 (1980).

A su vez, la Regla 20(C) de Evidencia, 32 L.P.R.A. Ap. IV, dispone que en los casos en que evidencia de carácter sea admisible, se presentará *mediante testimonio de reputación o en forma de opinión*. Por esta razón, cuando al amparo de la Regla 20(A)(3) de Evidencia, 32 L.P.R.A. Ap. IV, un acusado pretende presentar evidencia sobre el carácter de la víctima o un rasgo de éste para probar que la víctima actuó en conformidad con su carácter, el *único* método de prueba que puede utilizar · es testimonio de reputación o en forma de opinión.

Bajo nuestro ordenamiento probatorio, la utilización de prueba de actos específicos para demostrar carácter está limitada a *inquirir* en el contrainterrogatorio de un testigo que declara sobre el carácter de una persona sobre actos específicos pertinentes para impugnar ese testimonio. Nótese que la defensa *no puede traer prueba extrínseca sobre los actos específicos* en el directo y hay que limitarse a inquirir sobre éstos en el contrainterrogatorio. *Pueblo v. Fradera Olmo*, 122 D.P.R. 67 (1988); E.L. Chiesa, *Jurisprudencia en la zona criminal*, 58 Rev. Jur. U.P.R. 19, 22 (1989).

La otra ocasión en que puede presentarse prueba sobre actos específicos es en aquellas situaciones enumeradas en la Regla 20(B) de Evidencia, 32 L.P.R.A. Ap. IV (probar motivo, oportunidad, intención, preparación, plan, conocimiento, identidad o ausencia de error o accidente). Su propósito es "excluir la evidencia presentada sólo con miras a demostrar disposición criminal de un acusado". Chiesa, *Evidencia de carácter y de conducta específica bajo las Reglas de Evidencia de 1979*, supra, pág. 56. Evitar ese tipo de inferencia sobre la conducta del acusado es lo que se logra con esta regla. Nótese que en estos casos la propia regla dispone que la prueba de actos específicos *no puede usarse para probar el*

*carácter de una persona y que actuó en conformidad con su carácter.*

## III

Examinado brevemente el trasfondo doctrinal aplicable al caso de autos, analicemos los errores expuestos por el apelante.

En primer lugar, es preciso apuntar que la prueba de carácter excluida por el tribunal de instancia es sobre *actos específicos* de la víctima y que se trata de evidencia *extrínseca*. Los testimonios excluidos no son sobre la reputación de la víctima o en forma de opinión pericial sobre los efectos de la combinación del alcohol y la marihuana sobre el carácter de las personas. En el caso de autos es evidente que la prueba extrínseca sobre actos específicos de la víctima es inadmisible bajo la Regla 20(A)(3) y (C) de Evidencia, *supra*.

Tampoco es admisible bajo la Regla 20(B) de Evidencia, 32 L.P.R.A. Ap. IV, ya que no se trae para ninguno de los fines permitidos por esa regla y sí para que el Jurado infiera que debido a que la víctima actuó en conformidad con su carácter, probablemente él fue el primer agresor. Por otro lado, no puede decirse que la prueba de actos específicos se trae para probar que el apelante pensaba que él se encontraba en inminente peligro de muerte o de sufrir grave daño corporal, ya que él no tenía conocimiento de esos actos previos de la víctima.

Es preciso también evaluar la prueba excluida a la luz de las exigencias de la Regla 19 de Evidencia, 32 L.P.R.A. Ap. IV. Aun cuando ésta fuera pertinente, puede ser excluida debido a su escaso valor probatorio en relación con el peligro de causar perjuicio indebido y probabilidad de confusión. *Pueblo v. Ortiz Pérez*, 123 D.P.R. 216 (1989). El hecho de que la víctima haya fumado un cigarrillo de marihuana no hace más probable o menos probable el hecho de que ésta haya sido el primer agresor. Sin embargo, el testimonio de José Gómez Meléndez tiene un efecto muy perjudicial, ya que el Jurado puede pensar que si la víctima fumaba marihuana merecía morir o inferir que por encontrarse bajo los efectos de la droga fue el primer agresor.

Además, en cuanto al testimonio de Carlos Torres González sobre la discusión que tuvo la víctima con un hombre que le echó el brazo por la espalda a su esposa, es evidente que se trata de un hecho remoto, impertinente y de escaso valor probatorio.

Finalmente, el testimonio de William Rivas Malavé sobre las ocasiones en que la víctima había pretendido comprar balas para su revólver y que siempre andaba armado es de escaso valor probatorio para determinar quién fue el primer agresor y puede causar gran confusión y un enorme perjuicio. De hecho, el arma de la víctima nunca fue encontrada y la defensa no pudo realmente demostrar que el día de los hechos el occiso estaba armado. Si la víctima estaba armada o no al momento de los hechos no es prueba de carácter; se trata de un hecho que el apelante nunca pudo probar. Por ende, su testimonio tampoco era admisible.

Por los fundamentos expuestos anteriormente, confirmaríamos la sentencia recurrida. Los tres (3) testimonios no eran admisibles y el foro de instancia resolvió conforme al derecho probatorio.

Aunque coincidimos con la mayoría del Tribunal en cuanto a que la prueba presentada mediante el testimonio de José Gómez Meléndez y Carlos Torres González, referente a que el uso de alcohol y marihuana por la víctima no era admisible, discrepamos de que lo declarado por William Rivas Malavé no debía ser excluido.

Por último, no olvidemos que la Regla 5 de Evidencia, 32 L.P.R.A. Ap. IV, dispone que no se revocará sentencia o decisión alguna por motivo de exclusión de evidencia a menos que el tribunal considere que el efecto de la determinación fue un factor decisivo. *F.D.I.C. v. Caribbean Mktg. Ins. Agency*, 123 D.P.R. 247 (1989). Aun en el supuesto de que los testimonios hayan sido excluidos erróneamente, en las circunstancias particulares del caso de autos el error no fue un factor decisivo en la sentencia apelada. Contrario a la posición adoptada por la mayoría de nuestros compañeros, estimamos que *probablemente* el resultado no hubiera sido distinto de haberse admitido el testimonio de Rivas Meléndez y, por lo tanto, el error no fue perjudicial.

La exposición narrativa revela que hubo amplia prueba testimonial y que el Jurado aquilató adecuadamente la misma al rendir su fallo. La prueba demuestra que como resultado de un incidente en un negocio de bebidas alcohólicas hubo una pelea entre uno de los parroquianos y el dueño del local, y que el apelante negligentemente disparó su revólver hiriendo mortalmente al Sr. Carlos Miguel Cruz. A base de la prueba creída por el Jurado, el acusado fue absuelto del delito de tentativa de asesinato de la acompañante de la víctima. Tomando en consideración la naturaleza del incidente entre el acusado y el occiso, el Jurado también rebajó la calificación del delito de asesinato en primer grado a homicidio.

En estas circunstancias sería un grave error de nuestra parte revocar la sentencia apelada y devolver el caso para la celebración de un nuevo juicio por unos hechos ocurridos en 1986. Lo que procede es que confirmemos la sentencia apelada.